## 𝔚𝔶𝔱𝔥𝔢𝔳𝔦𝔩𝔩𝔢.

### LATHAM V. POWELL.

#### June 10, 1920.

1. SALES—*Caveat Emptor—Weight of Cattle—Case at Bar.*—Vendor of cattle f. o. b. shipping point brought an action for balance of purchase money against vendee. Vendee's grounds of defense were that an overcharge was made for the cattle, they not weighing as much as charged for, and that the quality of the cattle was not such as was to be delivered. The lower court applied the maxim of *caveat emptor,* both with respect to the quality and the quantity of the subject of the sale, in rejecting evidence of the vendee to the effect that the weight of the cattle as delivered f. o. b. at the shipping point was less than weight for which the vendor was seeking to recover; and, in instructing the jury that the vendee had the right to inspect the cattle, in order to ascertain whether the cattle came up to description and if not up to description, it was his duty to elect whether he would accept or reject the cattle and if afterwards the vendee dealt with the cattle as his own, and sold or otherwise disposed of them, he waived his right to object to the cattle on account of quality, or weight, and the jury should find for the plaintiff the amount of his claim and interest.

   *Held:* That it was certainly erroneous to apply the maxim of *caveat emptor* to the quantity of the subject of the sale—the aggregate weight of the cattle.

2. SALES—*Caveat Emptor—Weight of Cattle—Waiver—Case at Bar.*—Where the sale of cattle was at the price of so much per pound on board the cars at the points from which the cattle were shipped, the amount of purchase price which the vendor was entitled to demand was dependent upon the ascertainment of the actual weight of the cattle at such point unless the vendee by his conduct waived his right to question the accuracy of the aggregate weight charged against him. In the instant case, there was nothing in the evidence tending to show any such waiver.

3. SALES—*Caveat Emptor—Quality—Executory Contracts of Sale.*—The maxim *caveat emptor* applies, so far as quality is con-

cerned, as well to executory contracts of sale of chattels by description as to present sales of specific chattels, where, in the absence of fraud, there had been an acceptance of the subject of the sale.

4. SALES—*Caveat Emptor—Warranty.*—The maxim of *caveat emptor* does not apply to quality where there is an express warranty, or where there is a warranty implied from the nature and circumstances of the sale.

5. SALES—*Sales by Description—Implied Warranty.*—The American decisions treat a sale by description as analogous to a sale by sample, and hold that words of description imply a warranty that the property shall answer the description. The effect is to extend to breaches of condition of this class the remedies available in cases of breach of warranty, while at the same time the English remedy of rejection of the property is not denied.

6. SALES—*Sales to Order—Implied Warranty.*—Where a chattel is made or supplied to the order of the purchaser, there is an implied warranty that it is reasonably fit for the special purpose intended by the buyer, if that purpose be communicated to the vendor when the order is given.

7. SALES—*Cattle—Implied Warranty of Quality—Case at Bar.*—A buyer of cattle communicated to the vendor the special purpose for which he wished the cattle and expressly stated that for the cattle to be fit for such special purpose, the cattle must be *"good* cattle, weighing 900 to 1,000, if they are good. My trade does not want them unless they are good." Vendor replied that he could furnish cattle of good quality which would average "one thousand fifty."

*Held:* That under this contract of sale there was an implied warranty that the cattle were reasonably fit for the special purpose—*i. e.,* to supply the demands of vendee's trade, which required that none of them should be excessively large, above 1,050 pounds, or unreasonably below 900 pounds.

8. SALES—*Implied Warranty of Quality—Duty to Examine Goods.*— A buyer of cattle under an implied warranty of the quality of the cattle is not under obligation upon delivery of the cattle to examine the cattle and determine conclusively upon their correspondence with the contract. He may accept the cattle even though inspection would disclose or he already knows that they do not correspond with the agreement, losing thereby his right to subsequently reject them, but not necessarily his right to rely upon the implied warranty.

9. SALES—*Implied Warranty—Acceptance of Goods—Waiver of Rights.*—Unexplained acceptance of goods by buyer, sold under

an implied warranty of quality, may be strong evidence of satisfaction, but it is not conclusive, and may be rebutted by the circumstances. The question whether under all the circumstances the buyer intended to waive his rights under the warranty is a question for the jury.

10. SALES—*Warranty—Implied Warranty—Acceptance of Goods.*— Aside from the distinction that an express warranty may be relied on in a case of a sale of chattels in *praesenti*, whereas an implied warranty may not be relied on in such case, in executory sales of chattels, in the absence of an express stipulation in the contract of sale as to the effect of acceptance, there is, according to the weight of authority, and in reason, really no difference between the effect of the acceptance on the right of the vendee to rely on an express warranty from his right to rely on an implied warranty of quality. Wherever there is such warranty (whether express or implied is immaterial), the question of whether the vendee by acceptance of the subject of the sale intended to waive his rights under the warranty is a question of fact.

11. SALES—*Implied Warranty—Waiver of Rights—Case at Bar.*— In the instant case, the vendee immediately upon the receipt of the cattle, the subject of the sale, wired the vendor, "Cattle not good as represented." This circumstance accompanied and explained the retention of the possession of the cattle by the vendee and rendered the case one in which the conduct of the vendee was such that the jury could not infer therefrom that he waived his rights under an implied warranty of quality.

12. SALES—*Instructions—Interest.*—In an action by seller of cattle against buyer for balance of purchase price, the court instructed the jury that if they should find for the plaintiff they should allow interest from the time of delivery of the cattle.

*Held:* That this instruction was erroneous under section 3390 of the Code of 1904 (section 6259 of the Code of 1919), which permits the jury in actions on contract to allow interest and fix the period at which such interest shall commence.

13. APPEAL AND ERROR—*Judgment in Appellate Court—Remand.*— Where a case must be reversed, and the facts before the Supreme Court of Appeals are not sufficient for it to dispose of the case under section 6365, Code of 1919, the case will be remanded to the court below for a trial *de novo*, to be had if the defendant in error is so advised.

Error to a judgment of the Circuit Court of Prince William county, in an action of assumpsit. Judgment for plaintiff. Defendant assigns error.

*Reversed and remanded.*

This is an action of assumpsit by the vendor, the defendant in error, against the vendee, the plaintiff in error, seeking to recover a balance of purchase money for 149 cattle of the alleged weight of 157,257 lbs. at six and one-fourth cents per pound, aggregating $9,828.56, subject to a credit of $9,244.73, paid by the vendee on such account, leaving as such balance still due and unpaid the sum of $583.73.

The vendee pleaded the general issue of non-assumpsit, and filed two grounds of defense, which are as follows:

"1.    The quality of the cattle was not such as was to be delivered, there being jerseys, tail-ends and some big 'horsey' rough ones weighing over 1,050 lbs.

"2.    An overcharge was made for said cattle, they not weighing as much as charged for.

### "STATEMENT.

"149 cattle at 47 lbs.—7,003 lbs. over
    weight, at 6¼ cts.............. $437.69
"25c per hundred on 25 big cattle ....    69.51
"25c per hundred on 34 small or tail-
    enders .......................    76.53
                                    ———
                                   $583.73

On the trial of the case the vendor identified the following correspondence by letters and telegrams between the vendee and himself, and introduced the same in evidence:

"Haymarket, Va., September 27, 1916.

"MR. REUBEN A. POWELL,
    Grassy Cove, Tenn.

"Dear Sir:    You wrote me some time since if I could handle a string of good cattle, condition, etc.    I can handle

a string of *good* cattle, weighing 900 to 1,000 if they are *good*. My trade does not want them unless they are good. I can place 150 or 200. I would prefer them strung out not all at once. Write me what you have in sight, price, & etc.

"Yours truly,

"T. O. LATHAM."

"Crossville, 10-11-16.

"T. O. LATHAM, Haymarket, Va.

"Can sell you five loads thousand pounds feeder cattle, good quality, six and one-quarter cents, f. o. b. Crab Orchard, Tenn. Wire answer Crossville immediately.

"Telegram.            R. A. POWELL."

"Haymarket, Va., 10-12.

"R. A. POWELL, Crossville.

"Think I can sell the five loads of cattle if the freight is not too high.

"Telegram.            T. O. LATHAM."

"Crossville, 10-12-1916.

"T. O. LATHAM, Haymarket, Va.

"Have rate quoted me to Leesburg ninety dollars per car from Spring City on Q. & C., where I will load these cattle Saturday. Cattle are *good quality* and will average one thousand fifty. Wire shipping instructions and where to draw on you if you want the cattle.

"Telegram.            R. A. POWELL."

"Haymarket, ·Va., 10-13.

"R. A. POWELL, Crossville.

"Ship cattle to Haymarket thirty-six hours limit. No feed at Manassas. No jerseys or tail-end cattle accepted. Draw National Bank of Manassas.

"Telegram.                    T. O. LATHAM."


"Grassy Cove, Tenn., 10-14-1916.

"T. O. LATHAM, Haymarket, Va.

"Dear Sir:

"According to your instructions by wire am tonight shipping you five cars of 149 cattle as per enclosed bill and will draw on you for the amount next Monday at my bank, the First National of Crossville, at the First National of Manassas, Va. These are *good cattle* and I got weights on them. Drove them sixteen miles across the mountain so as to load on this road the C. Y. O. & T. P. at Evansville and Spring City. You unload these cattle, give them 10 days on good grass and then weigh them and send me their weights. Would like to know what they loose; of course it is not fair to weigh them right off the cars.

"Yours,

R. A. POWELL."

"Write me.

       Letter."

(Italics in foregoing correspondence supplied, except in the first letter of the vendee.)

"Grassy Cove, Tenn., 10/15, 1916.

"MR. T. O. LATHAM,

"Haymarket, Va.

"Dear Sir:

"I got the five cars out at 3 o'clock this morning all 'O. K.' mailed you bill of them last night. I ordered all cars thirty-six feet and they sent three big cars thirty-nine feet, but they marked on way bill thirty-six ordered so you won't have to pay freight on the extra size of cars. Freight is ninety per car on the three from Spring City and ninety-one per car on the two from Evansville they all five cars left here together at 3 A. M. this morning for Haymarket. Hope they come through all right and your customers are pleased with them. Let them fill up 10 days before you weigh them and they ought not to loose much weight. Write me how they get through will draw on you tomorrow through First National Crossville at First National Manassas, Va., as per your instructions.

"Yours,

"Letter                                    R. A. POWELL."

"Haymarket, Va., 1:40 P. M. 10/18.

"R. A. POWELL, Crossville, Tenn.

"Cattle not as good as represented. You had better come and help sell them.

"Telegram.                                T. O. LATHAM."

"Crossville, Tenn., October 21, 1916.

"MR. T. O. LATHAM,

"Haymarket, Va.

"Dear Sir:

"Your telegram of last Wednesday just received as I

live 13 miles out in the country and we had a storm that broke down the telephone line which I am on at Grassy Cove.

"I am very much surprised and hurt at your message as I shipped you the best cattle I have shipped this year and for less money than I have sold any for this year, and hoped to have you for a permanent customer. I have shipped 800 cattle into Loudoun county, Virginia, this fall at six and one-half and $1.00 per head f. o. b. Sparta where the freight is more than from Spring City where I loaded yours and they averaged over 100 pounds to the head lighter than the cattle I shipped you and no better quality if as good on the average.

"I shipped you the five cars of cattle as per your instructions by wire and drew draft on you at First National Bank of Manassas, Va., as per your telegram.

"I obeyed your instructions completely and had hoped to please you and have you for a permanent customer. If these five loads do not suit you you cannot be suited in this country for they are as good as we have if not better on the average. They are good doing cattle and will get fat as hogs and have the weight to them too.

"I had made all arrangements to ship them to Chicago when I got your telegram Friday evening giving me shipping instructions, and to draw on you for the cattle.

"I certainly expect you to pay off the draft I drew on you for these cattle as per your telegram. Of course, if I can do you any good by coming up there, I am willing to come, but do not see what good I could do you in your own country selling cattle. If you will give these cattle time to fill up on some good grass I am sure you will be better pleased with them.

"Respectfully,

"R. A. POWELL."

"Letter.              "Haymarket, Va., October 26, '16.
"R. A. POWELL,
     "Grassy Cove, Va.

"Dear Sir:

"Your letter of October 21st to hand. My wire message was not intended for a surprise or to hurt your feelings in any way. You may have shipped me the best cattle you have shipped this year, but I doubt if you have shipped any commoner cattle than some you shipped me. As to having me for a permanent customer that will be up to you. I never did business with a man in my life that I could not do business with again if I wanted to. As for your shipping 800 cattle into Loudoun county at six and one-half and a dollar a head f. o. b. Sparta I have nothing to do with. It seems strange to me under these conditions that you would ship me better and heavier cattle, as you claim, for twenty-five cents per hundred and one dollar a head less. As for shipping the cattle as per my instructions by me has nothing to do with the matter we have up at present. I do not suppose you consider that I bought the cattle from you because I made it a point in my telegram not to use a word that would in any way intimate that I was buying the cattle. The first cattle that you quoted me at six and one half cents were to be shipped from Crab Orchard, the second telegram does not state any price on cattle supposed to weigh fifty lbs. per head more to be shipped from Spring City. I do not know that these are the first cattle that you quoted me. You know as well as I know that persons selling cattle on commission do not pay for them before they sell them and I thought if you thought that I didn't know any better than to pay a draft on stock

cattle before I saw them or even sold them I would just let you draw. As for the draft I have never heard *one* word of it. If you had have asked me to send you my check for a few thousand dollars on the cattle I would not have hesitated a moment. As for obeying my instructions completely, I pay no attention to that whatever. You shipped these cattle to me instead of Chicago because you knew you have to take what they bring in Chicago and you thought possibly you might get six and one-quarter cents out of me—had these cattle have been all of good quality as you represented them to be, by wire, I had them all placed. As for your coming up here I really hardly think it worth while. Though I do not want to keep you from coming if you want to come.

"I have 115 of the cattle placed I think, the thirty-four tail-end cattle I do not know about yet—I have ninety-four head on my home grass a boundary of 225 acres that is good grass and plenty of good grass and plenty of good running water. I was sick when I ordered these cattle and was just getting about when they came. I went to Haymarket to receive the cattle—have been flat of my back ever since. Hope to make sale of all the cattle next week and send you settlement.

"Yours very truly,

"T. O. LATHAM."

"Grassy Cove, Tenn., Oct. 21, 1916.

"MR. T. O. LATHAM,

"Haymarket, Va.

"Dear Sir:

"Your letter dated the 26th, and postmarked the 27th, 5 P. M. just received. I certainly did *sell* you the five loads

of cattle. I wired you I could *sell* you five loads of cattle at six and one-quarter cents f. o. b. Crab Orchard, Tenn. Then I wired you I would load these cattle at Spring City, and if you wanted the cattle to wire me shipping instructions and where to draw on you for them. You wired me in reply to that wire, and ordered me to ship the cattle to Haymarket, and draw on you at National Bank of Manassas, which order I fully complied with. I loaded the cattle at Spring City instead of Crab Orchard in order to save freight and drove the cattle sixteen miles across the mountain as I wrote you at my own expense in order to save you more freight charges.

"You say in your letter that as for me shipping the cattle to you as per your instructions by wire has nothing to do with the matter, and also that you were sick when you *ordered* the cattle and that you went to Haymarket and received them cattle. If we have to settle the matter in the courts you may change your opinion about whether these things have anything to do with it or not. There was never a word said either by you or I in any of our communications about your selling the cattle for me on commission, to say nothing of agreeing on what commission you were to receive or what you were to sell the cattle for.

"*I sold you the cattle at six and one-quarter cents f. o. b. Spring City.* The only settlement you can make with me is to pay me the amount of the draft, $9,828.56 that you wired me to draw on you for the five loads of cattle, according to the itemized bill of the cattle I sent you from Spring City. My lawyer here advises that I can collect that amount off of you and also can collect a damage claim which would be my expenses and lawyer fees, court costs, etc., etc., traveling expenses, etc., in case you fail or refuse to pay the amount of that draft after ordering the cattle shipped to you and authorizing me to draw on you for the cattle.

"Please let me know at once what you intend to do about paying me for the cattle so that I may know how to proceed to collect it. If I have to bring suit to collect the pay for the cattle, I will also bring a damage suit against you at same time for lawyer's fees, court costs, traveling expenses, board bills, etc., etc.

"Very respectfully,

"R. A. POWELL."

Plaintiff further testified "that on the 14th day of October, 1916, he shipped to defendant three car loads of cattle from Spring City, Tenn., and two car loads of cattle from Evansville, Tenn., aggregating 149 head of cattle, billed to the defendant at Haymarket, Virginia. That thirty-two of these cattle were weighed sixteen miles from point of shipment on the 12th of October, 1916, at 32,150 lbs.; that thirty-two of these cattle were weighed on October 13, 1916, sixteen miles from point of shipment at 33,675 lbs.; that twenty-five of these cattle were weighed October 12, 1916, sixteen miles from point of shipment at 28,980 lbs.; and that sixty of these cattle were weighed a few days before shipment sixteen miles from point of shipment at 62,452 lbs; making an aggregate of 157,257 lbs., the testimony of the weight of the cattle at a place other than the point of shipment being admitted over the objection of the defendant, as appears from a subsequent certificate of objection."

Plaintiff further testified, "that the cattle were of good quality and of the grade called for in the contract, and that there were no jerseys or tail-enders in the lot; that the cattle were of as good grade as were usually shipped from that part of Tennessee; that the cattle of that part of Tennessee are not of as good grade as those of Southwest Virginia.

"That two days after the shipment of the cattle he made draft on the defendant through the National Bank of Manassas for $9,828.56; that such draft was returned unpaid and protested; about November 1; that shortly thereafter

he received from the defendant a check for $9,244.83. That the shipping distance was about 500 miles."

There was other testimony for the vendor tending to show that there were no jerseys or inferior quality cattle in those shipped to the vendee.

The vendee to sustain the issue on his part testified that "he received the cattle under protest; that all of his protest was contained in the letters and telegrams already introduced; that he had sold and disposed of all of the 149 cattle involved in the litigation * * * that f. o. b. Crab Orchard, Tennessee, means free on board the cars at Crab Orchard, Tennessee."

Thereupon the vendee tendered a number of witnesses, including himself, for the purpose of introducing evidence tending to sustain his grounds of defense, to the effect that the weight of the cattle as delivered f. o. b. cars at Spring City and Evansville, Tenn., was 7,003 lbs. less than the 157,257 lbs. weight for which the vendor was seeking to recover in this action; and that there were twenty-five big cattle and thirty-four small jerseys, or "tail-enders," among the cattle as delivered, and that their value f. o. b. cars at the points from which they were shipped was $69.51 and $76.53, respectively, as set out in the grounds of defense, less than their value would have been had they been up to quality of "good cattle" suitable for the vendee's "trade," which the vendee ordered, and which the vendor had agreed to ship and claimed that he in fact shipped. But the trial court refused to permit the vendee to introduce any of such testimony, on the ground that "if the defendant" (the vendee) "after an opportunity of examining the cattle, had taken them and sold them or converted them to his own use, that he was deemed to have accepted the cattle and to have waived all objections on account of shortage of weight or inferior quality and he would have to pay for them."

Thereupon the trial court granted the following instruc-

tion at the request of the vendor, over the objection of the vendee, which we will designate as No. 1:

## INSTRUCTION NO. 1.

"The court instructs the jury that if they shall believe from the evidence that the plaintiff sold the defendant the cattle mentioned in the account, by description at six and one-quarter cents per pound, on board cars, in Tennessee, and that the plaintiff delivered the cattle on board the cars in Tennessee, and consigned them to the defendant at Haymarket, Virginia, pursuant to his instructions, then the defendant, on the arrival of the cattle, had the right to inspect the cattle, in order to ascertain and determine whether the cattle came up to the description given by the plaintiff, and if the defendant believed the cattle did not measure up to the description, the duty then devolved on him to elect whether he would accept the cattle or reject them.

"And if the jury believe from the evidence that the defendant afterwards dealt with the cattle as his own, and sold or otherwise disposed of them, then the defendant waived his right to object to the cattle on account of quality, or weight, and you shall find for the plaintiff the amount of his claim, with interest thereon from October 14, 1916."

The court declined to give the following instructions asked for by the vendee:

A. "The court instructs the jury that the burden is on the plaintiff to establish by a preponderance of the evidence that he delivered on board cars in Spring City, Tenn., cattle of the goodness or standard required in the contract and of the weight claimed by him."

B. "The court instructs the jury that, if they believe from the evidence, the plaintiff, R. A. Powell, delivered to the defendant, T. O. Latham, certain cattle which did not come up to or comply with the quality provided for in the

contract, then for such cattle the said Latham is entitled to damages, the measure of the said damages being the difference between the value of such cattle as delivered and their value, had they been up to the quality to be delivered, the amount of such damages to be credited on the price of the said cattle."

And thereupon the court, at the request of the vendee, gave the following instruction, which we will designate as No. 2:

### INSTRUCTION NO. 2.

"The court instructs the jury that the burden is on the plaintiff to show by a preponderance of the evidence that he delivered on board the cars in Tennessee, cattle of the weight as claimed by him, consigned to the defendant."

Instructions Nos. 1 and 2 were all the instructions given in the case.

There was a verdict of the jury in favor of the vendor for the sum of $583.73, the amount of damages sued for, "with interest from October 14, 1916," upon which the judgment under review was entered accordingly.

*R. A. Hutchinson* and *H. Thornton Davies,* for the plaintiff in error.

*E. E. Garrett* and *Thos. H. Lion,* for the defendant in error.

SIMS, J., after making the foregoing statement, delivered the following opinion of the court:

The questions presented for our decision by the assignments of error will be disposed of in their order as stated below.

[1, 2.]   1.   The trial court, by its action in refusing to admit the testimony tendered by the vendee, in giving instruction No. 1, and in the refusal of instructions A and B, as set forth in the statement preceding this opinion, applied the maxim of *caveat emptor* to the case, both with respect to the quality and the quantity of the subject of the sale.

The chief question presented for our decision is whether such application of the common law maxim mentioned was erroneous?

We are of opinion that such application of the law was erroneous.

2.   It was certainly erroneous with respect to the *quantity* of the subject of the sale—the aggregate weight of the cattle.   This is not a case where the contract of sale stipulated for a specific quantity of the subject of the sale. The sale of the cattle was at the price of so much per pound on board the cars at the points from which the cattle were shipped, and the amount of purchase price which the vendor was entitled to demand was necessarily dependent upon the ascertainment of the actual weight of the cattle at such point; unless, of course, the vendee by his conduct waived his right to question the accuracy of the aggregate weight charged against him.   On this point we deem it sufficient to say that there is nothing in the evidence in the record tending to show any such waiver.

[3, 4] 3. The consideration of whether the maxim of *caveat emptor* is applicable to the quality of the subject of the sale in the case in judgment involves distinctions of some nicety, but which in reason and in accordance with the great weight of authority present no real difficulty as applicable to the case made by the record before us.   Whether such maxim is applicable here depends primarily upon whether, under the contract of sale in evidence, there was an *implied warranty* of the quality of the cattle sold; and, if so, then, secondarily, upon whether the vendee by his

conduct at the time of the delivery of the cattle and subsequently, waived his rights under the implied warranty as to quality?

4. It is true that the maxim *caveat emptor* applies, so far as quality is concerned, as well to executory contracts of sale of chattels by description, as to present sales of specific chattels, where, in the absence of fraud, there had been an acceptance of the subject of the sale. 2 Mechem on Sales (1891), sec. 1391. But such maxim does not apply where there is "an express warranty," or where there is a warranty "implied from the nature and circumstances of the sale." 2 Benjamin on Sales (6th Am. Ed.), section 965, p. 842. To the same effect see *Wilson* v. *Shackleford*, 4 Rand. (25 Va.) 5, and *Mason* v. *Chappell*, 15 Gratt. (56 Va.) 572, in both of which cases, however, the contract of sale was silent as to quality.

It is true that under the English rule on the subject, where there is a sale by a vendor of chattels, of an article by a particular description, *without more*—as said in 2 Benjamin on Sales (6th Am. Ed.), section 918, pp. 789-9: "* * * it is a condition precedent to his right of action, that the thing which he offers to deliver, or has delivered, should answer the description. Lord Abinger protested against the confusion which arises from the prevalent habit of treating such cases as warranty, saying: 'A great deal of confusion has arisen in many of the cases upon this subject, from the unfortunate use made of the word warranty. Two things have been confounded together. A warranty is an express or an implied statement of something which a party undertakes shall be a part of a contract, and though part of the contract, *collateral to the express object of it.* But in many of the cases, the circumstance of a party selling a particular thing by its proper description has been called a warranty, and the breach of such a contract a breach of warranty; but it would be better to distinguish

such cases as a noncompliance with a contract which a party
has engaged to fulfil; as if a man offers to buy peas of an-
other and he sends him beans, he does not perform his con-
tract; but that is not a warranty; there is no *warranty* that
he should sell him peas, the *contract* is to sell peas, and if ·
he sell him anything else in their stead, it is a nonperform-
ance of it.' " (Citing English cases.) "There can be no
doubt of the correctness of the distinction here pointed out.
If the sale is of a described article, the tender of an article
answering the description is a condition precedent to the
purchaser's liability, and if this condition be not performed,
the purchaser is entitled to reject the article, or if he has
paid for it, to recover the price as money had and received
for his use; * * *"

In such case, according to such rule, as stated in 2 Me-
chem on Sales, section 1392. "When the seller offers goods
'n performance of the contract * * * it becomes * * * not
only the right, but the duty of the buyer to examine the
goods so offered, and, if they do not satisfy the contract,
to reject them within a reasonable time. Failing to reject
them he declares his satisfaction with the seller's perform-
ance so far as inspection can disclose, and he can, in the ab-
sence of fraud, neither subsequently reject the goods nor
rely upon any implied warranty in respect to any defects
which were open to such observation."

[5] And reference to this English rule is made with ap-
proval in this State by the opinions of this court in *Mason
v. Chappell, supra,* (15 Gratt. [56 Va.] 583), and in *Inter-
national Har. Co.* v. *Smith,* 105 Va. 683, at p. 688, 54
S. E. 859. But these cases did not involve the question of
whether the right to rescind the contract *in toto* was the ·
sole remedy of the vendee in such case. And such is not
the prevailing American doctrine on the subject. The
American note to the section of Benjamin on Sales last
quoted (sec. 2, *Idem,* p. 799, note 32), says: "A sale by

description is upon condition that the thing sold answers the description. * * * The American cases almost unanimously treat conditions of this class as warranties." And again, in the American note 24 to section 966 of the learned work last mentioned, p. 844: "The American decisions treat a sale by description as analogous to a sale by sample, and hold that words of description imply a warranty that the property shall answer the description. The effect is to extend to breaches of condition of this class the remedies available in cases of breach of warranty, while at the same time the English remedy of rejection of the property is not denied." Citing Mass., N. Y., N. J., Wis., Mo., N. C., Pa., Tex., Cal., Me., and Canadian cases.

[6] However, it is unnecessary for us, in the case before us, to consider whether we should follow the English or the prevailing American rule on the subject under consideration, because in the contract in the case in judgment there was something more than a mere sale by description. And even under the English rule, as laid down in 2 Benjamin on Sales, section 966, p. 843: "where a chattel is made or supplied to the order of the purchaser, there is an implied warranty that it is reasonably fit for the * * * special purpose intended by the buyer, if that purpose be communicated to the vendor when the order is given * * *"

[7] Now according to the correspondence introduced in evidence by the vendor in the case in judgment, the order was given as a part of the correspondence in which the special purpose for which the cattle were intended by the buyer was communicated to the vendor, and that purpose, as stated in the letter of the vendee to the vendor of date September 27, 1916, was to supply the vendee's trade, and the communication expressly stated that for the cattle to be fit for such special purpose, they must be *"good* cattle, weighing 900 to 1000, if they are good. My trade does not want them unless they are good." In reply to this letter

the vendor on October 11th next, wrote to the vendee, "Can sell you five loads thousand pounds feeder cattle good quality * * * Wire answer * * * immediately." On October 12th, the vendee wired the vendor, "Think I can sell the five loads of cattle, if the freight is not too high." On the same day the vendor wired back to the vendee the freight rate and added—"Cattle are good quality and will average one thousand fifty? Wire shipping instructions and where to draw on you if you want the cattle." On the next day the vendee wired the vendor, "Ship cattle to Haymarket * * * No jerseys or tail-end cattle accepted * * *." The next day, October 14th, the vendor wrote the vendee that he was shipping that night 149 head of cattle "according to your instructions by wire * * *. These are good cattle and I got good weights on them." On October 15th the vendor wrote again to vendee saying that the cattle moved at three o'clock the previous night, stating the freight rate, and expressing the hope that they would "come through all right and your customers are pleased with them."

So that we see that "from the nature and circumstances of the sale," consisting in the subject of the sale being "supplied to the order of the purchaser * * * for * * * a special purpose intended by the buyer * * * communicated to the vendor when the order (was) given," there was under the contract of sale in question in the case in judgment "an implied warranty" that the cattle were "reasonably fit for * * * the special purpose" aforesaid—*i. e.,* to supply the demands of vendee's "trade," which required that none of them should be excessively large—unreasonably above 1050 lbs.—or should be jerseys, or "tail-enders," *i. e.,* unreasonably below the weight of 900 lbs., the weights last mentioned in the correspondence.

[8-10] The case in judgment, therefore, is one involving an implied warranty of the quality of the subject of the sale.

5. In such case, as laid down in 2 Mechem on Sales, sec. 1393, as the holding of the weight of authority: " * * * the buyer is" (not) "under * * * obligation to examine the goods and determine conclusively upon their correspondence with the contract. Acceptance unexplained may indeed be strong evidence of satisfaction, but it is not conclusive and may be rebutted by the circumstances. The seller's undertaking continues and follows the transfer of the title to the buyer. The latter may, therefore, accept the goods, even though inspection would disclose or he already knows that they do not correspond with the agreement, losing thereby his right to subsequently reject them, but not necessarily destroying his right to rely upon the implied warranty—the question whether, under all the circumstances, he intended to waive his rights being a matter for the jury." Citing numerous authorities.

It should be here noted that aside from the distinction that an express warranty may be relied on in a case of a sale of chattels *in praesenti*, whereas an implied warranty may not be relied on in such case (as is explained in 2 Mechem on Sales, sec. 1394, 1395); in executory sales of chattels, in the absence of an express stipulation in a contract of sale as to the effect of acceptance, there is, according to the weight of authority, and in reason, really no difference between the effect of the acceptance on the right of the vendee to rely on an express warranty, from his right to rely on an implied warranty of quality. Wherever there is such warranty (whether express or implied is immaterial), the question of whether the vendee by acceptance of the subject of the sale intended to waive his rights under the warranty is a question of fact. *Jacot* v. *Grossman Seed Co.*, 115 Va. 90, 105-7, 78 S. E. 646; *Eastern Ice Co.* v. *King*, 86 Va. 102, 9 S. E. 506.

In the case then of a warranty of quality, attendant upon an executory sale of chattels, such as is involved in the case

in judgment, the vendee may actually receive the possession of the subject of the sale and retain such possession and appropriate the goods to his own use, "without assenting that they are the ones contemplated by the contract." 2 Mechem on Sales, sec. 1370. The mere receiving does not, as a matter of law, imply the "acceptance" of the goods, in the sense that the buyer has assented to the appropriation of the specific goods to the contract—which is one of the four essential elements of importance necessary to complete the contract of sale. *Idem,* secs. 1364, 1369, 1370. But, in such case, the conduct of the vendee, when or after the goods are delivered, upon his inspection of them, where the defect in the goods is obvious, or would be disclosed by reasonable inspection, with respect to giving notice to the vendor that the goods are unsatisfactory, may be of importance as bearing on the mental attitude of the vendee in the premises—*i. e.,* upon the question of whether he has by his conduct at such time evidenced a waiver of his right to thereafter insist on the warranty; and also upon the question of estoppel, which often arises in such cases—*i. e.,* whether the vendee by his conduct in failing to notify has misled the vendor to the prejudice of the latter.

[11] In the case in judgment, however, we have the uncontroverted fact that immediately on the coming of the cattle into the possession of the vendee and his inspection of them, the vendee wired the vendor, "Cattle not good as represented. You had better come and help sell them." This circumstance, about the existence of which there is no controversy, accompanied and explained the retention of the possession, and distinguishes the case in judgment and renders it one in which the conduct is such that the jury could not have inferred therefrom that the conduct of the vendee in retaining and selling the cattle was such that he waived his rights under the implied warranty aforesaid. Hence, no instruction to the jury on that subject was or would be proper in the case before us.

6. To sustain the position that as a matter of law the retention of the cattle by the vendee and his appropriation of them to his own use was a waiver of his right to object to the quality of the cattle, the following authorities are cited and relied on for the vendor, namely: Clark on Contracts, p. 676, 35 Cyc. 608; *Syer & Co.* v. *Lester,* 116 Va. 541, 82 S. E. 123; *Linger* v. *Wilson,* 73 W. Va. 669, 80 S. E. 1108; *Allison* v. *Vaughan,* 40 Iowa 421-4; *Hirshhorn* v. *Stewart,* 49 Iowa 418; *Berthold* v. *Seevers Mfg. Co.,* 89 Iowa 506, 56 N. W. 669; *Minneapolis Selling Co.* v. *R. N. Cowin Co.,* 153 Iowa 129, 133 N. W. 338, 339, 40 L. R. A. (N. S.) 513. But all of these authorities, except the two cases last cited, involve the effort on the part of the vendee to rescind the contract in toto, and hence are not in point. In the two cases last cited, the decisions were expressly placed upon the ground of the retention of the goods by the vendee an unreasonable time, after knowledge of the defects and payment of a part of the purchase price, before giving any notice or making any complaint of the defects.

We are, therefore, of opinion that the trial court should have admitted the testimony which it refused to admit; should have refused to give instruction No. 1, which it gave; and should have given instructions A and B, which it refused to give, inserting "and Evansville, Tenn." after the words "Spring City, Tenn." in instruction A. And it affirmatively appears from the record that this erroneous action was prejudicial to the vendee, hence it is reversible error.

[12, 13] 7. The sole remaining question for our consideration is this: "Was instruction No. 1 erroneous in its peremptory direction to the jury as to the time from which they should find by their verdict that interest should begin on the amount of the verdict?

This question is ruled by *Washington, etc., Co.* v. *Westinghouse,* 120 Va. 620, 89 S. E. 131, 91 S. E. 646, and the

instruction was erroneous in this particular. It is true that if there had been no other error in the case we might have removed that error by abating the interest, as was done in the case just cited, or by some action substantially to the same effect; but, for the reasons above stated, the case must be reversed, and as the facts are not sufficiently before us to dispose of the case under the statute in such case made and provided (Code 1919, section 6365), the case will be remanded to the court below for a trial *de novo*, to be had if the plaintiff is so advised, but not in conflict with the views expressed in this opinion.

*Reversed and remanded.*