**INSURANCE COMPANY OF NORTH AMERICA, INC., Plaintiff–Appellant,**

v.

**U.S. GYPSUM COMPANY, INC., Defendant–Appellee.**

**No. 88–1110.**

United States Court of Appeals, Fourth Circuit.

Argued Jan. 11, 1989.

Decided March 13, 1989.

Rehearing and Rehearing In Banc Denied April 11, 1989.

James Thomas Ferrini (Richard R. Winter, Clausen, Miller, Gorman, Caffrey & Witous, P.C., Chicago, Ill., Wade Massie, Penn, Stuart, Eskridge & Jones, Abingdon, Va., Samuel P. Gerace, Jones, Gregg, Creehan & Gerace, Pittsburgh, Pa., on brief), for plaintiff-appellant.

Stephen Cassidy Neal (Kevin T. Van Wart, Lise T. Spacapan, Walter R. Lancaster, Kirkland & Ellis, Christopher J. McElroy, U.S. Gypsum Co., Chicago, Ill., R. Harvey Chappell, Jr., Mary Metil Grove, Orran Lee Brown, Christian, Barton, Epps, Brent & Chappell, Richmond, Va., Jackson S. White, Jr., White, Elliott & Bundy, Abingdon, Va., on brief), for defendant-appellee.

Before SPROUSE and CHAPMAN, Circuit Judges, and MOTZ, United States District Judge for the District of Maryland, sitting by designation.

MOTZ, District Judge.

Insurance Company of North America ("INA") appeals from a multi-million dollar jury verdict entered against it in favor of United States Gypsum Company ("USG"). The jury found INA liable under an "all risk" policy for damages sustained by USG as a result of a massive earth subsidence which occurred on November 4, 1984 beneath one of its plants located in Plasterco, Virginia.

Finding that no error was committed below, we affirm.[1]

I.

The period 1979 to 1983 was a time of soaring interest rates. During those years insurance companies engaged in what was known as "cash flow underwriting," vigorously competing with one another for premium revenues. In order to obtain those revenues for reinvestment, the companies lowered their underwriting criteria as well as reducing their prices.

USG had been insured by Protection Mutual for almost 35 years. In 1982 USG was approached by insurance brokers and asked to give them an opportunity to improve its insurance program. As a result, in March 1983, USG put its property insurance program up for competitive bidding. Much to its present regret, INA eventually won that bidding. On June 1, 1983, without requiring USG to submit an insurance application, it issued a policy providing complete property and casualty protection in an aggregate amount of over $1.2 billion at over 120 USG locations. The policy contained a higher-than-average deductible of $250,000, and it did not contain (as INA's underwriting manuals authorized it to do) any exclusion for subsidence losses. INA reinsured losses of over $5 million with Industrial Risk Insurers, an association of insurance companies partially owned by INA.

Plasterco was one of the USG locations insured under the policy. USG has been mining gypsum at that location since 1910, when it took over the mining operation from a smaller company which had been operating there since the late 1800's. There are several mines at the location, one of which (No. 6) is said to be unique in the world. Until it was closed and abandoned in 1979, No. 6 mine was mined on sixteen levels to a depth of 14,000 feet. It was approximately two and one half miles in length, and its width varied from 200 feet

---

1. Two of the District Court's opinions in this case have been reported. In the first of these opinions the Court denied a motion for partial summary judgment filed by USG on INA's claim that USG procured the policy in question through fraud and misrepresentation. *See Insurance Company of North America v. U.S. Gyp-* *sum Co.,* 639 F.Supp. 1246 (W.D.Va.1986). In the second opinion the Court found that the damages suffered at the Plasterco facility were fortuitous. *See Insurance Company of North America v. U.S. Gypsum,* 678 F.Supp. 138 (W.D. Va.1988).

at the surface to 2,000 feet at a depth of 700 feet.

USG also conducts manufacturing operations at Plasterco. Prior to the November 4, 1984 subsidence event, there were 37 buildings at that location, many of which were on the surface above No. 6 mine. The major buildings were a gypsum board plant and a mill. When USG closed the No. 6 mine in 1979, it spent $12 million modernizing the Plasterco facility and doubling its production capacity.

Over the years there were incidents of subsidence at Plasterco. In the 1940's a large hole, known as the "grave hole," developed and thereafter three other holes developed around it. (None of these played any factor in the November 4, 1984 subsidence event). Four other holes likewise developed. All of these holes were vertical sinkholes or caveholes of limited scope, and none of them caused any damage to property other than a small piece of asphalt paving which had to be repaired for less than $700 in 1969. USG was concerned, however, about the stability of the area and, in addition to conducting its own monitoring over the years, periodically hired two professors expert in matters of geology and rock mechanics to provide consulting advice.

The subsidence event which gave rise to this action occurred around noon on Sunday, November 4, 1984. Its effects were catastrophic. Three caveholes appeared, the largest of which was 300 feet in diameter and 100 feet deep, and an area of more than 21 acres collapsed, dropping as much as six feet. Power and water lines were severed, and the flume system at the confluence of two creeks was destroyed. Water flowed into the mine, and buildings began to sink. Extensive damage was caused to a public highway and to railroad tracks in the area. Although the board plant was saved, the structural integrity of the mill was destroyed and later, after it began to break apart, it had to be abandoned and a new mill built at another loca-

tion. USG's total loss was estimated to exceed $34 million, $24.8 million of which it successfully sought to recover from INA in this suit.

## II.

INA first argues that the November 4, 1984 event was not "fortuitous" and that the losses resulting from it were therefore not covered by the policy. A fortuitous event is one "which so far as the parties to the contract are aware, is dependent on chance." *Restatement of Contracts*, Section 291, comment A (1932); *Compagnie des Bauxites de Guinee v. Insurance Company of North America*, 724 F.2d 369 (3d Cir.1983); *Intermetal Mexicana S.A. v. Insurance Company of North America*, 866 F.2d 71 (3d Cir.1989).[2]

The District Court, to whom the parties agreed to submit the fortuity issue, concluded that the November 4th event was fortuitous. The Court found as follows:

All of the witnesses who testified on behalf of USG stated that they did not expect the occurrence of a loss of this magnitude. The testimony of the witnesses showed that the losses which have occurred in the past at Plasterco or other USG locations were minor property losses. Furthermore, the sinkholes which had occurred prior to the accident were located at places beyond any areas where property was located. USG was monitoring and caring for the facility to prevent any catastrophic damage from occurring at any place where any plants were located. Certainly, a subsidence event was a risk at any USG location where mining had been ongoing. Indeed, subsidence is likely to occur on the earth above a mine but any resulting damage is at best a risk, not a certainty, especially where precautions are taken. Insurance companies do insure risks, and the subsidence damage in this case was just that—a risk.

There was no certainty that any subsidence was destined to occur or, in partic-

---

**2.** The parties agree that Virginia law applies to all of the issues presented in the case. They further agree that although there is no Virginia case on point, Virginia would follow the fortuity doctrine.

ular, that it was destined to occur within the time limits of the policy in issue. USG had adopted and implemented a rather costly program to reduce the risk of subsidence damage. All of the witnesses who testified in this case stated that the catastrophic subsidence which occurred on November 4, 1984 was unexpected. INA produced no witnesses who testified to the contrary. Until that day, no damage had ever occurred that would have given rise to a claim under INA's policy at Plasterco.

USG's conduct before the June 1, 1983 policy date is perhaps the strongest evidence that the firm did not expect a catastrophic subsidence of the earth at Plasterco. In 1978 and 1979, USG invested $12 million modernizing the plant, which tended to double production capacity. USG would not have invested such sums if it expected a major catastrophe. In the week prior to the subsidence, USG spent several thousands of dollars repairing a large portion of its parking lot, most of which was destroyed during the subsidence. November 1, 1984, two USG employees, including the mine superintendent, entered the mine to observe its condition. Certainly, they would not have risked their lives roaming around a mine that was expected to collapse. The event occurred on a Sunday with the plant in normal operation. Again, USG would not jeopardize the lives of a full shift of employees if it expected a catastrophe. USG did expect some movement in the limited area of the gravehold and cordoned off this area; yet, the earth actually subsided at the entire plant area, not just at the gravehold.

*Insurance Company of North America v. U.S. Gypsum Co.*, 678 F.Supp. at 142–43.

The Court drew these conclusions after hearing and judging the credibility of USG witnesses who denied foreknowledge of the event, and the evidence fully supports the constituent factual findings underlying the Court's ultimate finding of fortuity. INA contends, however, that as a matter of law the November 4th event was not fortuitous because the evidence is undisputed that prior to November 4th USG was aware of the certainty that further subsidence would occur at Plasterco.[3] *Cf. Intermetal Mexicana, supra.*

As the District Court noted, the fact that it is known that subsidence will occur does not mean that it will occur during the policy period. Moreover, there is a fundamental distinction between the certainty of subsidence and the certainty of resulting loss. An INA expert admitted at trial that there is a certainty of subsidence from the moment that mining operations begin at any location. Thus, if, as INA contends, the certainty of subsidence precludes fortuity, there never could be coverage for subsidence damage. That proposition, however, is contradicted by INA's own underwriting manuals which list subsidence as one of "the other 'all risk' perils which may cause severe loss."

■ INA's related argument that the damage from the November 4th event was a "loss in progress" and was therefore not covered, *see generally Bartholomew v. Appalachian Ins. Co.*, 655 F.2d 27 (1st Cir. 1981); *Drewett v. Aetna Cas. & Sur. Co.*, 539 F.2d 496 (5th Cir.1976), fails for the same reasons. Although it is undisputed

---

**3.** The piece of evidence which most strongly supports INA's position is an April 6, 1983 report prepared by Dr. James Scott, one of the outside experts periodically retained by USG, in which he stated that "I am certain that failure to the surface will occur some time in the future and that damage will occur to the surface facilities that are in close proximity to where sinkholes develop." However, Dr. Scott, while perceiving the inevitability of subsidence, recommended that USG take certain actions to reduce the risk of resulting damage. On November 23, 1983, after investigating steps which USG had taken upon his recommendations, he submitted

another report in which he stated that "it is my professional opinion that management has selected a course of action to solve the problems at this property." Furthermore, although after the November 4th event, Dr. Scott (in recommending continued monitoring) stated "from the rock mechanics [sic] viewpoint, the degree of accuracy demonstrated in predicting the subsistence is quite remarkable," the fundamental nature of the November 4th event, involving a broad-ranging collapse, was substantially different from the periodic development of sinkholes which Dr. Scott had anticipated in his April 6, 1983 report.

that subsidence was occurring prior to November 1, 1984, it is likewise undisputed that prior to November 4th subsidence had not damaged any of the facilities at Plasterco. Moreover, the November 4th event did not occur until seventeen months after the INA policy was issued. Thus, this is not a case where the forces which eventually led to the subsidence and collapse created an immediate threat of loss at the time that the policy was issued. *Compare Summers v. Harris,* 573 F.2d 869 (5th Cir. 1978).

### III.

■ INA also argues that it was entitled to a judgment notwithstanding the verdict and that the District Court committed various errors in its instructions to the jury. These arguments proceed from the premise that USG was under an affirmative duty to disclose the conditions which existed at Plasterco regardless of whether INA made any inquiry into them. The premise is unsound. Virginia law is clear that an insured "is bound only to disclose such matters as may be inquired about ... or unless it is made imperative upon him by some condition of the policy." *Wytheville Ins. & Bkg. Co. v. Stultz,* 87 Va. 629, 13 S.E. 77, 80 (1891); *Greensboro Nat. Life Ins. Co. v. Southside Bank,* 206 Va. 263, 142 S.E.2d 551, 555 (1965); *Franklin Fire Ins. Co. v. Bolling,* 173 Va. 228, 3 S.E.2d 182, 185 (1939); *North River Ins. Co. v. Lewis,* 137 Va. 322, 119 S.E. 43, 45 (1923).

INA points to language in a single Virginia case, *Home Ins. Co. v. Berry,* 175 Va. 447, 9 S.E.2d 290 (1940), to support its position. There, the Supreme Court of Appeals stated that " 'fair dealing requires that he (the insured) should state everything which might influence, and probably would influence the mind of the underwriter in forming or declining the contract.' " 9 S.E.2d at 292, *quoting Columbian Ins. Co. v. Lawrence,* 27 U.S. (2 Pet.) 23, 48, 7 L.Ed. 335 (1829). This statement was merely dictum since the insurance policy in issue contained a provision which specifically voided the policy if, as the insured had failed to disclose, notice of sale of the insured property for non-payment of a mortgage had been given. No similar provision voiding coverage for non-disclosure of potential subsidence damage was contained in INA's policy. To the contrary, the INA policy provided that it was void only if USG had "wilfully concealed or misrepresented material facts" or "in case of any fraud or false swearing by the Insured." The jury found under proper instructions that USG was not guilty of any such misconduct, and that finding was fully supported by the evidence.[4]

To hold, as INA urges, that an insured is under a general duty of affirmative disclosure would, in effect, be to place the burden of underwriting decisions upon the insured and not the insurer. This would turn the relationship between an insured and its insurer on its head and nullify the duty of an insurer to act reasonably to protect its own interests. *See North River Ins. Co. v. Lewis,* 119 S.E. at 45. Here, the evidence showed that INA, because of its desire to obtain substantial revenues from USG for reinvestment at the high interest rates then prevailing, did not require USG to file any insurance application, did not make inquiries to USG concerning matters which it now claims were material to the risks which it was underwriting, did not review documents available in USG's files containing the reports and memoranda upon which it now bases its claim of non-fortuity and did not conduct an independent investigation of the properties to be insured. Inter-

---

4. INA also points to the testimony of Robert Russell, who was INA's Manager of Corporate Insurance in 1983, in which Russell said that "the answer ... would be yes" to the question "isn't it also customary for the insurer to rely on the good faith of the intended policy holder to disclose known hazards and risks or losses that are in progress?" The examining lawyer did not define his term "known risks and hazards." However, in context he clearly appears to have been referring to a risk or hazard "certain to occur" within the meaning of the fortuity doctrine since he also included in his question the related concept of "loss in progress." Thus, Russell's testimony supports nothing more than the proposition that an insured must disclose damage which he knows is certain to occur, and reliance on his testimony does not advance INA's case at all in light of our conclusion that the November 4, 1984 event was fortuitous.

ested in high returns, INA assumed a high risk, and it has suffered the consequences of its own imprudence.

## IV.

INA's remaining assignments of error need be considered only summarily.

■ First, INA argues that counsel for USG made an improper opening statement by asking the jurors to consider whether any of them would like to be accused of fraud based upon the evidence which they were about to hear. The law is clear that although it is improper to ask jurors to place themselves in the position of a party, such a "golden rule" argument does not constitute reversible error if no prejudice arise from counsel's comment. *See Arnold v. Eastern Airlines, Inc.,* 681 F.2d 186, 199–200 (4th Cir.1982), *cert. denied,* 460 U.S. 1102, 103 S.Ct. 1801, 76 L.Ed.2d 366 *on rehearing, Arnold v. Eastern Airlines, Inc.,* 712 F.2d 899 (4th Cir.1983), *cert. denied* 464 U.S. 1040, 104 S.Ct. 703, 79 L.Ed. 2d 168 (1984). Here, where the remark was made during an opening statement in a three-week trial in a contest between two large corporations, the absence of any prejudice flowing from it is self-evident.

■ Second, INA contends that an *ex parte* statement given by H.L. Byars, who had inspected the Plasterco plant for Industrial Risk Insurers (the reinsurer), was improperly admitted into evidence. Byars did not testify at trial but he had been deposed and his deposition was read at trial. During his deposition Byars had been shown his statement and stated under oath that the answers which he had given were "truthful" and "honest." INA had had this statement for three months prior to the deposition and had ample opportunity to cross-examine Byars about it during the deposition. Under these circumstances the statement was properly admitted.

■ Third, INA challenges the damage award in various respects. None of these challenges are meritorious. The evidence established that because there was no warehouse stock and because other USG plants were performing at full capacity, the lost production at Plasterco was equivalent to lost sales, and therefore USG was entitled to business interruption damages. The jury was properly instructed that USG could recover "sue and labor" damages for expenditures which were reasonably incurred in attempting to reduce the losses which were suffered whether or not those attempts were successful, *see, e.g., Home Ins. Co. v. Ciconett,* 179 F.2d 892, 895 (6th Cir.1950); *White Star S.S. Co. v. North British & Mercantile Ins. Co.,* 48 F.Supp. 808, 812–813 (E.D.Mich.1943), and the evidence fully supported the jury's finding that USG's claimed expenditures were reasonable under the circumstances. Likewise, the evidence sustained USG's claim that despite the efforts which USG made to save the mill after November 4, 1984, post-event experience demonstrated that the mill had been rendered totally inoperative. Since the estimate for stabilizing the mill site was $2 million more than USG spent in replacing the mill at another site, the costs of relocating and rebuilding the mill were fully recoverable. Finally, the jury was acting completely within its province in awarding prejudgment interest and determining the date from which such interest should be awarded. *See* Virginia Code, Section 8.01–382; *Beale v. King,* 204 Va. 443, 132 S.E.2d 476, 480 (1963); *Latham v. Powell,* 127 Va. 382, 103 S.E. 638, 644 (1920).

AFFIRMED.