STEWART-SMITH HAIDINGER, INC., "Certain British Insurance Companies", more particularly designated as Excess Insurance Co., Ltd., Phoenix Assurance Co., Ltd., Phoenix Assurance Co., (Compagnie D'Assurances Maritimes Aeriennes & Terrestres Societe Anonyme [Camat] Per Westminster Aviation Insurance Co., Ltd., Threadneedle Insurance Co., Ltd., Trident Insurance Co., Ltd., Scottish Lion Insurance Co., Ltd., Mentor Insurance Company [U.K.] Ltd., Per Mentor Underwriting Agency [U.K.], Ltd., Appellants,

v.

AVI-TRUCK, INC., Loretta W. Coward, a/k/a Lori Coward, individually and as personal representative of the estate of Bob D. Coward, deceased, Robert S. Murnan, and Kiku Murnan, Appellees.

No. 6796.

Supreme Court of Alaska.

March 30, 1984.

Sanford M. Gibbs, Hagans, Brown & Gibbs, Anchorage, for appellants.

Roger W. DuBrock, Roberts & Shefelman, Anchorage, for appellees.

Before BURKE, C.J., and RABINOW-ITZ, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

COMPTON, Justice.

This is an appeal from an award of $60,000.00 on an aircraft hull insurance policy to Appellees, Avi-Truck, Inc., and its owners, Loretta W. Coward, Robert S. Murnan and Kiku Murnan (jointly referred to as "Avi-Truck"). The hull claim arose out of the total loss of a Chase YC–122 aircraft on January 31, 1977, when it crashed following takeoff from Anchorage International Airport. The insurer, Stewart-Smith Haidinger, Inc. and "certain British insurance companies" (jointly referred to as "Stewart-Smith") challenge the award, claiming that certain exclusions in the policy avoided coverage and that, in any event, Avi-Truck does not have standing to sue because it is not a named insured in the insurance contract. For the reasons set forth below, we affirm the award.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 1976, Trans-Northern Aleutian, Inc. ("TNA") was an air transport company which operated a fleet of small aircraft. TNA, which was looking for a larger aircraft to use for moving large equipment, first became interested in the YC–122 in the summer of 1976. The YC–122 was a twin-engine, multi-crew surplus military aircraft, one of the few of its kind built sometime during the late 1940s or early 1950s. Robert Murnan, the chief mechanic for TNA, and Dick Clawson, a pilot working for TNA, ferried the plane from Palmer to Anchorage in early December, 1976. Although TNA had initially considered purchasing the YC–122, after the plane reached Anchorage TNA decided it would lease the aircraft instead. Murnan and Bob Coward, another mechanic for TNA, and their wives decided to purchase the aircraft, and formed Avi-Truck, Inc. in order to do so. They purchased the aircraft on December 29, 1976 and leased it to TNA on January 14, 1977. The lease agreement included a clause requiring TNA to insure the hull of the aircraft for $60,000.00.

TNA's president, Lloyd Sudder, obtained the insurance for the YC–122 through Jack Good, an employee of Frank B. Hall and Company, an insurance brokerage. Sudder contacted Good about insuring the plane before the ferry flight and discussed the insurance with him several times thereafter. The parties dispute what information Sudder gave to Good concerning the aircraft. It is undisputed that Good was told the make and model of the YC–122 and that it would be used only for carrying cargo. Good went to the TNA offices to look at the plane and was aware that it was significantly larger and older than the other aircraft that he insured for TNA and the only one that would not be carrying passengers as well as cargo. It is also undisputed that the question of whether the YC–122 had an airworthiness certificate was never discussed. Good incorrectly assumed that the YC–122 had an airworthiness certificate. What is in dispute is whether Sudder told Good that the aircraft would be used as a "public use" aircraft, i.e., one that is restricted to transporting government cargo, and that it was an ex-military aircraft. The significance of this information is that, as a practical matter, an airworthiness certificate could not have been obtained for the YC–122 for carrying private cargo for hire. Without this certificate, the aircraft could only be legally used for carrying government cargo. Furthermore, after talking with FAA employees, TNA believed that certain regulations concerning pilot qualifications would not apply to public use aircraft.

The parties also dispute whether Good was told that TNA did not own the plane. Although Sudder testified that he told Good that TNA would be leasing the aircraft, Good assumed TNA owned it. Avi-Truck was not named on the policy.

Good ordered insurance through John Chapman, a representative of the insurer, Stewart-Smith Haidinger, Inc. Chapman

could act as an underwriter and bind certain London carriers under his "in-house" authority, or he could act as a broker and forward the risk to the London market through a London broker. After investigating the airworthiness of the YC–122, Chapman decided to do the latter, because of the aircraft's age and because he was "suspicious" of a plane he had never heard of.

Good issued a binder on December 13, 1976, which provided coverage for the ferry flight from Palmer to Anchorage and then ground coverage until the plane's first flight. Flight coverage was added on January 24, 1977. The binder provided that the plane would be used for carrying freight for hire and would be flown by pilots with specified qualifications. Although the binder indicated that a new policy of insurance would be issued to cover the YC–122, the coverage was effected by adding the aircraft to an existing hull insurance policy covering other aircraft operated by TNA. The endorsement adding the YC–122 to the fleet policy was not issued until February 8, 1977, one week after the aircraft crashed.

The YC–122 crashed on its second flight while carrying school supplies for the Bureau of Indian Affairs. Stewart-Smith disclaimed liability based on several exclusions in the policy.

The underlying action was commenced by Alaska Statebank, which sued Avi-Truck in order to collect on a loan that Avi-Truck had obtained to purchase the YC–122. Avi-Truck filed a third-party complaint against Frank B. Hall and the insurers, alleging that it was entitled to the proceeds of the TNA insurance policy.

Various cross-motions for partial summary judgment were filed, and on June 5, 1980, Judge Singleton entered an "Order for Partial Summary Judgment and to Simplify Issues." That order included conclusions both that Avi-Truck had standing to sue even though it was not a named insured on the policy, and that exclusion (c)

of the policy, which required an airworthiness certificate to be "in full force and effect," would not avoid coverage, even though the aircraft had no airworthiness certificate. Stewart-Smith challenges these two conclusions on appeal.

The case went to trial on July 20, 1981. After five days of testimony Judge Souter ruled that coverage for the loss of the YC–122 existed. "Final Judgment as to Fewer than All Claims and Parties" was entered, awarding Avi-Truck $60,000.00, the amount of the hull coverage policy. In making the award the trial court found that the aircraft's pilot's lack of proper "type rating" did not justify avoiding liability under the policy, since TNA had been informed by the FAA that its pilots could legally fly a public use aircraft. Stewart-Smith challenges this finding and claims that the testimony by TNA employees as to statements made by FAA employees should have been excluded as hearsay.

## II. AVI–TRUCK'S STANDING TO SUE

In its 1980 Order of Partial Summary Judgment, the trial court held that Avi-Truck had standing to sue the insurers under TNA's insurance contract. The court based its holding on a finding that:

[T]he third party plaintiffs were within the class of persons contemplated to be covered by insurance at the time the insurance contract was negotiated, i.e. within the class of owners and operators of the aircraft. The court further finds that the persons contemplated to operate the aircraft, the pilots contemplated to fly it, and the persons contemplated to service the aircraft, remained unchanged at all times during the negotiation of coverage and thereafter, and that the risk to the carriers was not effected [sic] by ultimate ownership of the aircraft being placed in Avi-Truck, Inc.

It therefore concluded that Avi-Truck had standing to sue the insurers as a third-party beneficiary to the insurance contract.[1]

1. Avi-Truck initially claimed standing as assignee of TNA and of Alaska Statebank, the loss

payee on the insurance contract. The trial court denied the claim of assignment from TNA

Stewart-Smith contends that the trial court's conclusion that Avi-Truck had standing to sue as a third-party beneficiary was both legally and factually erroneous. It argues that a third-party beneficiary contract can exist only if both parties intended to benefit a third party at the time the contract was negotiated. It claims that Avi-Truck therefore cannot be a third-party beneficiary to the insurance contract because (a) it was not named in the contract, (b) Stewart-Smith was not aware of Avi-Truck's existence until after the accident, and (c) Avi-Truck did not even exist when the contract was initially negotiated. It also claims that the risk it undertook would be increased by the addition of Avi-Truck as a beneficiary.

▆▆▆▆ Stewart-Smith's claim that the insurance contract was not technically a third-party beneficiary contract is correct. Before a third party right in a contract will be recognized, the parties to the contract must intend that at least one purpose of the contract is to benefit a third party. *State v. Osborne*, 607 P.2d 369, 371 (Alaska 1980). Since Avi-Truck did not exist when the contract was initially negotiated, we cannot find that the parties specifically intended that Avi-Truck would benefit from it. We therefore cannot imply a third-party beneficiary contract from the facts of this case.

However, the trial court's findings do not indicate that the insurance contract was, on its face, intended to benefit Avi-Truck. Rather, the court concluded that, under the special circumstances of this case, a third-party beneficiary contract should be implied at law. We find considerable support in our cases and in those of other jurisdictions for the trial court's position.

In a recent line of cases, we have held that an unnamed party may have rights as an implied beneficiary of an insurance contract. In *Alaska Insurance Co. v. RCA Alaska Communications*, 623 P.2d 1216

(Alaska 1981), we held that, where a landlord obtains fire insurance in accordance with a lease provision requiring him or her to do so, his or her tenant should be considered a co-insured, and cannot be sued for negligence under a subrogation claim by the insurer. In *Olympic, Inc. v. Providence Washington Insurance Co.*, 648 P.2d 1008 (Alaska 1982), we refused to apply *RCA*'s "implied insured doctrine" in a case where a lease provision required the lessee to obtain liability insurance on the lessor's behalf, but where the lessee obtained the insurance in his name only. We noted that:

> The dispositive distinction between the present case and *RCA* is that in *RCA* the insurer seeking subrogation had contractually agreed to insure against loss due to fire. . . . It is from that context which we assessed the reasonable expectations of the parties with respect to fire loss due to the tenant's negligence. In contrast, ... Providence did not contractually agree to insure against risks attributable to Olympic [the lessor].

*Olympic*, 648 P.2d at 1014. We thus held in *Olympic* that the risk the insurer undertook was determinative in deciding whether to imply additional insureds on an insurance policy.

▆▆▆▆ Although we have not previously held that an implied beneficiary may proceed directly against an insurance company[2] for the proceeds of an insurance contract, courts of other jurisdictions have done so. In *Farmers Insurance Exchange v. Nelson*, 479 S.W.2d 717 (Tex.Civ.App. 1972) a lessee insured himself as owner despite a lease provision requiring him to obtain insurance for the lessor. The court held that the lessor was entitled to a share of the insurance proceeds, and allowed him to proceed directly against the insurer, even though the insurer had been unaware of the lessor's existence until after the property was destroyed. *Id.* at 721. In

and declined to reach the question of assignment by the bank. Neither party has raised the question of assignment on appeal, and we therefore will not consider it.

2. We limited our holding in *RCA* to subrogation claims against an implied co-insured. 623 P.2d at 1220.

*Taylor v. Audubon Insurance Co.*, 357 So.2d 912, 914 (La.App.1978) a buyer/mortgagor was allowed to proceed against an insurer for his share of the proceeds of a policy maintained by the seller/mortgagee in her own name but paid for by the buyer. The court found that since the insurer had intended to insure the owner of the house, and since there was no evidence that it would not have insured the buyers as owners, the policy should be equitably reformed to include the buyers as beneficiaries.[3] *See also Lighting Fixture & Electric Supply Co. v. Continental Insurance Co.*, 420 F.2d 1211, 1214 (5th Cir. 1969).[4]

■ In *Farmers Insurance* and *Taylor*, the requirement that the insured obtained coverage for the third party, combined with the insurer's intention to cover the owner of the insured property brought the third parties within the class of beneficiaries contemplated by the parties. In both cases the courts held, in effect, that persons within that class should be allowed to proceed directly against the insurer. We agree, and conclude that where the risk to the insurer is unchanged, and where a third party is within the class intended to be benefitted by the parties to an insurance contract, a third-party beneficiary insurance contract may be implied at law.

■ We must now determine whether the undisputed evidence supports a holding that a third-party beneficiary contract should be implied in this case. Stewart-Smith contends that the trial court's findings as to the risks contemplated in the insurance contract and as to its intended class of beneficiaries were not supported by undisputed evidence.

Stewart-Smith first argues that adding Avi-Truck as a beneficiary to the insurance contract would in fact alter the risk which the insurers originally agreed to undertake. It bases this contention on the fact that Avi-Truck retained the right to do maintenance on the aircraft and the fact that Avi-Truck, unlike TNA, was not a certificated carrier. In reality, however, regardless of who owned the aircraft, Bob Coward and Robert Murnan (who were both TNA mechanics and the principals in Avi-Truck), would have been maintaining it. Similarly, since TNA, rather than Avi-Truck, would be operating the plane, Avi-Truck's lack of certification appears irrelevant to Stewart-Smith's risk. Stewart-Smith has pointed to no other evidence which indicates that Avi-Truck's ownership of the plane altered its risk, and we find no reason to dispute the trial court's finding.

Stewart-Smith also suggests that Avi-Truck was not within the class of beneficiaries contemplated by either party. It contends that, when insurance was bound in early December, TNA fully intended to insure itself as owner of the plane. This contention is not borne out by the evidence. TNA initially obtained insurance for the YC-122 to cover the ferry flight from Palmer to Anchorage. At that time, according to the uncontested testimony of Lloyd Sudder, TNA was merely "interested" in purchasing the plane. However, TNA apparently never directly negotiated with the plane's previous owners, nor did its board of directors ever authorize the purchase of the plane. From the time that Sudder initially contacted Jack Good for the purpose of discussing insurance until

---

**3.** In *Taylor*, as in the instant case, the insurers were unaware of the existence of third parties; indeed, the policy was merely a continuation of the one which the sellers had maintained prior to the sale of the house.

We find "implication at law" of a third-party beneficiary contract a better label then "reformation." Reformation is a means of correcting mutual mistakes and thus conforming a contract to the clear intentions of the parties. *Riley v. Northern Commercial Co.*, 648 P.2d 961, 969 (Alaska 1982).

**4.** Other jurisdictions have come to the opposite conclusion. *See, e.g., Spires v. Hanover Fire Ins. Co.*, 364 Pa. 52, 70 A.2d 828, 831–832 (1950). The court in that case rested its holding in part on a concern about the added risks to which an insurer would be subjected if an unnamed third party were allowed to proceed directly against it. Since we agree with the trial court's finding that the insurers' risks are unchanged if Avi-Truck is allowed to proceed directly against it, we decline to follow the *Spires* holding.

the Murnans and the Cowards decided to form Avi-Truck and purchase the airplane, TNA considered a number of options with respect to the plane, including purchasing it, leasing it, and lease-purchasing it. Several combinations of people associated with TNA (including a proposed partnership of Sudder, Coward and Murnan) also considered purchasing it.[5]

Avi-Truck actually purchased the YC–122 on December 29, 1976, and leased it to TNA on January 14, 1977. The lease included the following provision:

Lessee agrees to provide all insurance on aircraft as follows:

| | |
|---|---|
| Hull insurance | $ 60,000.00 |
| Liability | $1,000,000.00 |

with copies of declaration supplied to Lessor. An advance notice of 30 days will be given to Lessor prior to cancellation of any insurance coverage.

Although this provision does not explicitly state that the insurance was to be obtained for the benefit of Avi-Truck, the testimony of Lloyd Sudder and Robert Murnan indicates that the parties to the lease intended that TNA should insure the plane on Avi-Truck's behalf.

It is evident that, at the time the insurance was initially bound, TNA intended to insure the airplane for its own benefit or for the benefit of whoever eventually purchased it. Avi-Truck was within this class of potential owners of the aircraft. By the time flight insurance attached on January 24, 1977, TNA had obligated itself to insure the plane on Avi-Truck's behalf.[6] Avi-Truck was thus clearly within the class of beneficiaries intended by TNA. It is also evident, as discussed above, that the risks and performance contemplated by the in-

surers were identical whether TNA or Avi-Truck owned the plane, and that Stewart-Smith intended to insure the interest of the owner of the plane. Avi-Truck thus fell within the class of beneficiaries contemplated by Stewart-Smith.

We thus find substantial undisputed evidence that Avi-Truck was within the class of beneficiaries intended by the parties, and that its addition as a beneficiary does not increase the risk undertaken by Stewart-Smith. We therefore affirm the trial court's holding that Avi-Truck had standing to sue Stewart-Smith on the insurance contract.

### III. AIRWORTHINESS CERTIFICATE

Stewart-Smith's second challenge to the 1980 Order of Partial Summary Judgment concerns the court's ruling that the absence of an airworthiness certificate in the YC–122 did not defeat coverage under the insurance contract. Exclusion (c) in the policy provided that coverage does not apply "while the aircraft is in flight unless its airworthiness certificate is in full force and effect." The insurers relied in part on this exclusion when they denied coverage under the policy. They now argue that the superior court decided to strike exclusion (c) on the basis of disputed facts and that the Order of Summary Judgment was therefore erroneous.

The superior court based its holding on two alternative theories. First, it found that the language of exclusion (c) "is ambiguous as a matter of law." It noted that "unless its airworthiness certificate is in full force and effect" could be interpreted

---

**5.** When asked at his deposition whether the plane was brought to Anchorage for TNA or for Murnan and Coward, Sudder replied,

Well, I'm not quite sure how to answer that like who the plane was brought back for. I mean—they brought the airplane back to do the work for it. At that particular time, I don't even think it was decided who was going to end up with the ultimate purchase of the airplane.

**6.** Negotiations about additions to the contract took place throughout December and January.

For example, Del Dillon was added as pilot in command (pending completion of 50 hours in the aircraft) on December 15, Alaska Statebank was added as loss payee on about January 10, 1977, and flight coverage was added on January 24, 1977. While it is unclear from the record exactly when the Murnans and the Cowards decided to buy the airplane, Avi-Truck (which was formed expressly for the purpose of purchasing the YC–122) was incorporated on December 20. Sometime before that date Murnan and Coward paid $10,000.00 toward the plane.

to mean that whatever airworthiness certificate the plane had when it was insured must *remain* in full force and effect. The court found that "in this case the status quo involved an aircraft which had no airworthiness certificate and no practical means for obtaining one for the uses designated in the policy," and that status quo was thus in fact preserved.

◼ In *U.S. Fire Insurance Co. v. Colver*, 600 P.2d 1 (Alaska 1979), we stated that "due to an inherent disparity in bargaining power between the insurer who drafts the contract and the insured, ambiguous coverage and exclusion clauses must be resolved in favor of coverage whenever possible." *Id.* at 3 (citations omitted). Ambiguity exists "only when the contract, taken as a whole, is reasonably subject to differing interpretations." *Id.* We believe that exclusion (c) is not reasonably subject to differing interpretations. Even when construed against the insurers, the phrase "its airworthiness certificate must be in full force and effect" clearly requires that the aircraft have an airworthiness certificate and that it be in effect at the time of the flight.

◼ The second basis for the trial court's ruling was a finding that the policy with the exclusion did not reflect the bargain made by the parties. The court reasoned that the intention of the parties, as indicated by the insurance binder, was to insure a YC–122 for carrying cargo. Since a YC–122 could not obtain an airworthiness certificate for carrying cargo, the policy, as it finally appeared, with the requirement of an airworthiness certificate, did not reflect that intention. The court concluded that:

An insurance policy that comes back and says, in effect, we'll take a premium, but we're not going to provide you any coverage at all for the purpose which you have articulated, seems to me to materially alter the bargain and therefore cannot be deemed a part of this contract.

Stewart-Smith contends that the trial court's conclusion required a finding as to the bargain reached by the parties which was not supported by uncontested evidence. It argues that the court implicitly found that both parties actually knew that the plane would be used as a public aircraft[7] without an airworthiness certificate and that they intended that coverage would exist even absent a certificate. Since Jack Good denied that he knew that the plane would be used only for public use or that it did not have an airworthiness certificate, that finding was not supported by undisputed facts. Stewart-Smith therefore claims that summary judgment was erroneously granted. *See Braund, Inc. v. White*, 486 P.2d 50, 53–54 (Alaska 1971).

We disagree with Stewart-Smith's analysis. Whether or not the insurers knew that the plane had no airworthiness certificate, it is undisputed that they undertook to insure it for carrying cargo. It is also undisputed that, as a practical matter, a YC–122, like most surplus military aircraft, could not have obtained an airworthiness certificate for carrying cargo.[8] If the insurers had any reason to know that an airworthiness certificate was virtually unobtainable under these circumstances, their agreement to insure the plane for carrying freight includes an implied agreement to insure it without an airworthiness certificate.

7. A "public aircraft" is one which is "used exclusively in the service of any government or of any political subdivision thereof ... but not including any government-owned aircraft engaged in carrying persons or property for commercial purposes." 49 U.S.C. § 1301(36). A public use aircraft may be used to carry government cargo for hire.

8. According to the affidavit of Dayton Curtis, Chief of the FAA Engineering and Field Office, surplus military aircraft have been eligible for certificates in three categories since 1947. Certification under two of these categories is extremely expensive and time consuming and has only been accomplished in a few cases by the original manufacturer of large military aircraft. The third category limits the use of the plane and forbids the use of the certificated plane for hauling cargo for hire. Mr. Curtis indicated that information about certificates is included in a publication which is readily available to the public.

Stewart-Smith argues that Jack Good was reasonable in assuming that the YC–122 would be operated under TNA's air taxi certificate rather than as a public aircraft, and therefore that the plane had an airworthiness certificate. It claims that TNA should have informed Good if the plane would be subject to another use not requiring an airworthiness certificate.

Leaving aside the question of the reasonableness of Good's assumption,[9] we believe that the burden was on the insurers to inquire about the use to which the plane would be put, as well as its possession of an airworthiness certificate. Absent intentional misrepresentation, Stewart-Smith cannot deny recovery because TNA failed to volunteer information which the insurers did not request. "It is an insurer's duty to ascertain the facts, and if nothing is concealed, and it makes no inquiries, it cannot complain that the situation was not what it supposed it to be." 9 G. Couch and R. Anderson, Couch Encyclopedia of Insurance Law § 38.72 at 388. *Accord, National Aviation Underwriters, Inc. v. Fischer,* 386 F.2d 582 (8th Cir.1967), *Graham v.*

*Aetna Insurance Co.,* 243 S.C. 108, 132 S.E.2d 273, 275 (1963), *Uslife Credit Life Insurance Co. v. McAfee,* 29 Wash.App. 574, 630 P.2d 450, 453 (1981).

Stewart-Smith presented no evidence that TNA made any misrepresentations about the aircraft in the process of obtaining insurance.[10] Absent evidence of "intentional withholding of material facts which good faith and fair dealing require [it] to disclose," TNA's failure to discuss the plane's lack of an airworthiness certificate does not rise to the level of misrepresentation. 9 G. Couch and R. Anderson, Couch Encyclopedia of Insurance Law § 38:6 at 338.[11]

Moreover, we believe that the unusual nature of the airplane and the significant difference between it and the other planes operated by TNA should have alerted the insurers to the need to investigate the risk they were insuring. It is apparent from the evidence before the trial court that such an investigation would have disclosed that the aircraft might not have an airworthiness certificate.[12]

---

9. Good knew that the plane was different from TNA's other planes in that it was over 12,500 pounds, had twin engines and would be used only for cargo. Sudder testified that, because the plane weighed more than 12,500 pounds, it could not have been used under the air taxi certificate which TNA possessed at the time.

10. When the case went to trial in 1981, Stewart-Smith alleged misrepresentation and fraud on the part of TNA. The trial court found that "[t]here was no evidence whatever" to support the charge. The materials before the court at the time of partial summary judgment were similarly devoid of evidence of affirmative misrepresentation.

11. Courts have been reluctant to find misrepresentation when information was not directly solicited. Thus, failure to mention a wife's terminal cancer when obtaining multiple insurance on her life, *Uslife Credit Life Ins. Co. v. McAfee,* 29 Wash.App. 574, 630 P.2d 450, 455 (1981), failure to disclose previous collection of fire insurance when obtaining a fire insurance policy, *Graham v. Aetna Ins. Co.,* 243 S.C. 108, 132 S.E.2d 273, 275 (1963), and failure to disclose that a healthy woman who accompanied the insured when he applied for insurance on his wife's life was not his wife, *Greensboro Nat'l Life Ins. v. Southside Bank,* 206 Va. 263, 142

S.E.2d 551 (1965), have been held not to rise to the levels of misrepresentation.

12. Indeed, when John Chapman, the Stewart-Smith agent responsible for the policy, first was asked to insure the plane, he did conduct an investigation. He sought information from people who had seen the plane and looked it up in *Jane's All the World Aircraft Encyclopedia.* The entry in *Jane's* included information on the plane's size and the fact that the YC–122 had been manufactured in limited numbers for the military. On the basis of his investigation he decided not to insure the plane in-house, but to send it directly to the underwriters in London. He did not pass along the information he had gathered because he expected them to conduct their own investigation: "I was not going to hold London's hand."

Mr. Chapman (who was British and had only been in the U.S. for about 18 months when he handled the TNA account) testified that the connection between public use aircraft and the absence of airworthiness certificates was not well known in London. He himself was apparently unaware that private companies could operate public use aircraft.

Jack Good testified that it was his impression that aircraft manufactured for the military often did not have airworthiness certificates, and

We need not reach the question of whether the insurers' failure to investigate the availability of an airworthiness certificate for the YC–122 would have justified the court in striking exclusion (c) had the policy been issued before the plane crashed. In fact, at the time of the crash, the policy had not been issued, and the only written statement of coverage was a binder which indicated that the YC–122 was insured for "Freight Carrying for Hire." A binder is generally considered to include the usual terms of similar policies. AS 21.42.240.[13] Although the policy to which the YC–122 was added was the "usual" one for TNA, it clearly was not the "usual" policy for an aircraft, which, as a practical matter, could not have obtained an airworthiness certificate for the purpose for which it was insured. It therefore cannot be presumed to have included an airworthiness certificate exclusion.

■ We conclude that, absent a "usual" policy, the binder must be interpreted in accordance with the reasonable expectations of the insured. Under such an interpretation, the binder for the YC–122 implied that the plane was insured when it carried freight for hire in the only legal manner it could reasonably have been expected to do so: as a public use aircraft and without an airworthiness certificate. In light of the insurers' burden of investigating the risk they agreed to underwrite, Stewart-Smith must be charged with knowledge of the bargain implied by the binder. By subsequently issuing a policy which denied liability when the aircraft was flown under those circumstances, it impermissibly altered the nature of this bargain. *Cf. Mutual Fire Insurance Co. v. Gold-*

*stein,* 119 Md. 83, 86 A. 35 (1912) (issuance of a policy including a clause prohibiting additional insurance which was not mentioned in the binder "change[d] the terms of the present insurance without the consent of the insured." *Id.* at 36).

We therefore affirm the trial court's order striking the policy exclusion for aircraft without airworthiness certificates.

## IV. PILOTS' TYPE RATING

Stewart-Smith's third contention on appeal is that the trial court erred in refusing to find that exclusion (d) of the policy allowed the insurers to avoid liability.[14] Exclusion (d) provides in relevant part that no coverage is afforded while the aircraft "is being operated by any ... person in violation of the terms and limitations of his Civil Aeronautics Administration Pilot's Certificate or Medical Certificate." Stewart-Smith contends that the aircraft's pilots violated their CAA licenses, because the pilot was not "type rated" for large aircraft in violation of 14 CFR § 61.31(a) and the co-pilot did not have the minimum of three takeoffs and landings in violation of 14 CFR § 61.55. Avi-Truck concedes that the pilots were in violation of these regulations, but contends that the regulations are not applicable to pilots of public aircraft.

Several TNA employees testified that they had contacted the Federal Aviation Administration and had been told that, if the plane was operated as a public aircraft, its pilots need not be type rated. Avi-Truck contends that this information was correct, or at least that TNA was reasonable in believing that it was correct, and that the exclusion should not apply.

that obtaining a certificate for a military plane was difficult.

Combined with the affidavit of Dayton Curtis indicating that information on the certificability of aircraft was available to the public, the testimony of Good and Chapman indicates that had the insurers investigated the aircraft reasonably thoroughly, they would at least have been put on notice that it might lack an airworthiness certificate and that it might be legally operable to carry freight without one.

**13.** AS 21.42.240 provides that:

(a) A binder or other contract for temporary insurance may be made orally or in writing, and shall be considered to include all the usual terms of the policy as to which the binder was given together with the applicable endorsements designated in the binder, except as superseded by the clear and express terms of the binder.

**14.** The trial court reached this conclusion after a five-day trial on the merits of the case.

After trial, the court concluded that FAA regulations required that the pilots of public aircraft be type rated. The court ruled, however, that the pilot certificate exclusion has no applicability because TNA reasonably expected that coverage would exist regardless of that requirement.[15]

■ In *Stordahl v. Government Employees Insurance Co.*, 564 P.2d 63, 66 (Alaska 1977), we recognized that because of the inequality of bargaining power between the insured and the insurer, an insurance policy would be considered a contract of adhesion and would be construed to provide "the coverage which a lay person would have reasonably expected, given a lay interpretation of the policy language." (Footnote omitted). *See also O'Neill Investigations v. Illinois Employers Insurance*, 636 P.2d 1170, 1177 (Alaska 1981) ("[W]e will honor the expectations of the parties as to coverage when those expectations are objectively reasonable."). The insurers contend that the reasonable expectations rule in *Stordahl* is not applicable to this case because Sudder cannot be considered a lay person, in light of his experience in the air taxi business and in insuring aircraft. Avi-Truck responds that, although Sudder was experienced in the air transportation industry, he was not an expert in the aircraft insurance business. We agree. Sudder's testimony indicates that, although he had insured several aircraft, he had only a layman's understanding of insurance policies and relied on the expertise of insurance agents. We therefore interpret the insurance contract in accordance with the reasonable expectations of TNA.

■ We agree with the trial court's finding that TNA was reasonable in expecting that it was covered by the policy when the aircraft was flown by its pilots. First, several TNA employees had spoken to representatives of the FAA, including its legal counsel, and had been assured that type ratings were not required—or even is-

sued—for public use aircraft. Under these circumstances, TNA was clearly reasonable in expecting that its pilots could legally fly the YC–122.

Second, the binder issued by the insurers included a specific pilot warranty indicating that the plane would be flown by "[a]ny properly certificated pilot in command with minimum 5000 total time 2000 multi-engine and approved by insured." The binder made no mention of type rating. In addition, Jack Good corresponded with TNA employees and with Stewart-Smith about Delbert Dillon's (the co-pilot when the YC–122 crashed) experience and license. Thereafter, the insurers approved him as pilot in command pending completion of 50 hours in the aircraft. This correspondence made no mention of type ratings. Moreover, TNA employees had discussed the qualifications of TNA pilots with Good, and Good referred to their hours and licenses in telexes to Stewart-Smith. Under the circumstances, TNA was reasonable in believing that Stewart-Smith intended to insure the plane as it was flown by TNA pilots, whose qualifications the insurers knew.

As we pointed out in *INA Life Insurance Co. v. Brundin*, 533 P.2d 236, 242 (Alaska 1975), a "layperson's expectations of insurance coverage are of course formed by many factors besides the language of the policies themselves." In this case, TNA's expectations were formed by the language in the binder, its own conversations with Good about the specific qualifications of the TNA pilots who would be flying the plane, and the information it received from the FAA regarding the legality of operation of a public aircraft by those pilots. Moreover, for the reasons discussed in Part III, *supra*, TNA was reasonable in expecting that the insurers knew or should have known that the plane would be flown as a public aircraft. It could therefore reasonably assume that, when Stewart-Smith approved its pilots, it knew of the FAA's position that they could legally fly

---

**15.** Avi-Truck challenges the court's conclusion that federal law required the pilots to be type rated. Since we affirm the trial court's holding that the exclusion does not avoid coverage, we do not address that contention.

the YC–122. Based on these factors, TNA's expectation of coverage while the plane was flown by its pilots was reasonable. We accordingly affirm the trial court's holding that exclusion (d) will not avoid coverage under the policy.

## V. HEARSAY

 Stewart-Smith's final contention on appeal is that the trial court erred in admitting the testimony of TNA employees as to their conversations with FAA officials. Stewart-Smith argues that such testimony was irrelevant and inadmissible as hearsay under Alaska R.Evid. 802.

Alaska R.Evid. 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Where testimony is offered to establish that a statement was made, rather than to prove its truth, the hearsay rule does not apply. *Putnam v. State*, 629 P.2d 35, 40 (Alaska 1980).

The testimony about the FAA officials' statements was not offered to prove the truth of those statements, i.e., that pilots of public use aircraft need not be type rated. Instead, it was offered to prove that the statements were made, and that TNA's belief that its pilots could legally fly the YC–122 was therefore reasonable. The testimony is thus relevant only as it relates to the state of mind of TNA employees who heard the statements, and the reasonableness of their actions in reliance on them.

In *International Longshoremen's & Warehousemen's Union v. Juneau Spruce Corp.*, 189 F.2d 177 (9th Cir.1951) the Court of Appeals for the Ninth Circuit faced a similar challenge to the admissibility of out-of-court assertions to prove the reasonableness of the conduct of persons who relied on them. In that case, the director of a lumber mill had closed the mill based upon reports that longshoremen would refuse to unload his lumber if it was delivered to various ports. The court stated that the director's testimony as to the reports was admissable, "not as proof of the truth that the ports ... were in fact closed to appellee, but only to show that appellee, in relying on such reports, acted in a reasonable manner in closing its mill." *Id.* at 192. Similarly, the testimony of TNA's employees was admissible to show that TNA was reasonable in believing that Stewart-Smith's apparent willingness to insure its pilots was consistent with FAA regulations.

AFFIRMED.