# Richmond

GREENSBORO NATIONAL LIFE INSURANCE COMPANY v. SOUTHSIDE BANK, ET AL.

June 14, 1965.

Record No. 5939.

Present, All the Justices.

*Dabney Overton* (*Overton & Overton,* on brief), for the plantiff in error.

*Gordon Lewis* (*Joseph E. Spruill, Jr.,* on brief), for the defendants in error.

SPRATLEY, J., delivered the opinion of the court.

On April 30, 1962, Paul Tompkins, sometimes hereinafter referred to as plaintiff, procured from Greensboro National Life Insurance Company (Greensboro) a certificate of credit life insurance upon the life of plaintiff's wife, Nettie Tompkins. Southside Bank, Tappahannock, Virginia, (Bank), a creditor of the plaintiff and his wife, was named as beneficiary for the amount of the balance due Bank from plaintiff and his wife, upon the death of Nettie Tompkins. The policy was one of a number issued under a Master Group Policy or Franchise Credit Life Policy from Greensboro to the Daingerfield Agency, Tappahannock, Virginia.

After the death of Mrs. Tompkins, this action was instituted against Greensboro by Tompkins to recover on behalf of himself and Bank the balance of the indebtedness due Bank from plaintiff and his wife. Greensboro denied liability on the ground that the policy of insurance was procured by fraud. A verdict was returned by the jury in favor of the plaintiff in the sum of $5,400.18, with interest from September 14, 1962, the date of Mrs. Tompkins death, and judgment was entered accordingly by the trial court. The amount is not in dispute.

We are asked by Greensboro to reverse the judgment on the grounds that the evidence discloses that plaintiff perpetrated a fraud upon it, and for errors of the trial court in granting and refusing certain instructions.

The facts are not in dispute, except as to the question whether plaintiff held out to Greensboro another woman, in apparent good health, as his wife at the time the certificate of insurance was issued. That question was fairly and clearly submitted to the jury in instructions, and the jury, by its verdict, answered in the negative.

Paul Tompkins, 69 years of age, and Nettie, his wife, 61, a Negro couple, had been married more than 43 years. In 1958, they borrowed $6,600.00 from the Southside Bank, repayment to be made,

with interest, in 180 monthly installments. The loan was evidenced by a note executed by each of them and secured by a deed of trust on their real estate. Mr. and Mrs. Tompkins had discussed between themselves many times the obtaining of credit insurance to cover their indebtedness to the Bank; but plaintiff said they had postponed such action because of the lack of funds. They had also, at some time or times, consulted an officer of the Bank about the same matter.

Mrs. Tompkins was a practical nurse and actively engaged in her profession until about March 22, 1962. Prior to the latter date, she was, according to her husband, apparently in good health until she suddenly began to have some trouble with her teeth. She visited a dentist, who extracted several. Due to excessive bleeding from the extractions, she was advised that she should go to a hospital for blood transfusions. She entered a hospital on March 23, 1962, and remained there until April 11, being treated for loss of blood and pneumonia. Upon discharge from the hospital on April 11, she returned home, and thereafter visited the hospital at weekly intervals for treatment.

The entry registry at the hospital showed that she was admitted for "diagnostic studies," and under date of April 27, showed that she had "acute leukemia." The record does not indicate that Tompkins was informed of the diagnosis, and he testified that he had no knowledge that his wife suffered from leukemia until the latter part of June, 1962.

On April 30, 1962, Tompkins consulted John R. Ferry, Executive Vice-President of Bank, about procuring credit life insurance to cover the debt of himself and wife to Bank. Ferry advised him that he could probably get a better premium rate directly through an insurance agency rather than through the Bank, and suggested that Tompkins go to such an agency and check the rate. Ferry did not recall that Tompkins was accompanied by anyone at the time of their consultation. On the same day, Tompkins went to Daingerfield Agency and conferred with Harry T. Gladding, Jr., one of the owners of that insurance agency; applied for credit insurance on the life of his wife; and there was issued the certificate of insurance here involved.

No written application for credit life insurance was required by the rules of Greensboro, and none was required to be furnished by Tompkins. Nor was there required any medical examination or information as to the health of the person to be insured.

Upon making application for the insurance, the only information

requested by Gladding of Tompkins was the age of his wife, her full name, and her Post Office address. This information was truthfully and correctly furnished by plaintiff, and inserted in the certificate of insurance. Information of the amount of the debt to Bank was furnished by Bank.

Tompkins positively and repeatedly testified that he was not accompanied by anyone when he went to the office of Daingerfield and made application for the policy. Gladding asked him no questions about the health of his wife. Plaintiff said he did not regard his wife's illness as being serious; that he thought she was in good health, except for trouble with her teeth; that he was not told by anyone, and did not realize prior to April 30, 1962, the date of the application for the insurance, that the illness of his wife was serious; that he attached no great importance to blood transfusions and the extraction of teeth, because he had personally gone through both experiences; and that he did not know his wife had leukemia until "sometime around the last of June."

Tompkins further said that, after his wife had her teeth extracted, he observed no great change in her appearance; that upon her return from weekly visits to the hospital, she attended to her nursing duties and performed her usual functions around the home; and that she went out to do her shopping on Fridays as before.

The premium on the policy was $55.41 for the first year, of which $25.00 was paid in cash, and the balance subsequently paid by Tompkins or his wife. The premium on the policy, if renewed, decreased for subsequent years as the installment loan indebtedness decreased.

Greensboro presented four witnesses, Gladding and three employees of Daingerfield, who really agreed on only one matter, viz., that Tompkins was accompanied by a woman, in apparent good health, when he applied for the insurance. They said that plaintiff and his alleged woman companion discussed, between themselves, the question upon whose life the policy should be issued; that neither Tompkins nor his companion made any statement, declaration, or representation as to the identity of the woman. None of the witnesses knew Mrs. Tompkins.

The issuance of the policy was a normal transaction in a busy office writing insurance with annual premiums of $150,000.00. The above four witnesses admitted that, after the death of Mrs. Tompkins, they "discussed and tried to reconstruct what happened," when the policy was issued. Their respective descriptions of the alleged woman

were uncertain and confused as to her size, weight, height, age, and shade of coloring. One said she was about 5 feet, 3 inches and weighed 110 pounds; another said she was 5 feet, 6 inches and weighed 150 pounds. Gladding thought she was about 50 odd years of age, although the certificate of insurance gave the age of Mrs. Tompkins as 61, as furnished by her husband. Mrs. Shirley C. Carneal, one of the employees, when asked: "You just inferred from the fact that she and Paul were talking about whether to put the insurance policy in his wife's name or his name, that she was his wife?" answered: "Right."

Gladding and another witness "assumed," for the same reason, that the alleged woman companion of the plaintiff was his wife.

The defense of Greensboro is based mainly on its contentions: (1) that the testimony of Gladding and the three employees of Daingerfield showed that Tompkins, on April 30, 1962, practiced a fraud upon it by holding out another woman as his wife; and (2) that Tompkins failed in his duty to inform Gladding that Mrs. Tompkins was on that day actually confined in a hospital for treatment.

The court gave eleven instructions to the jury. They fully covered the issues in the case. They told the jury that the burden of proving misrepresentation and fraud was on Greensboro, and that he who alleges fraud must clearly and distinctly prove it. On behalf of Greensboro, the jury was told that, "a fraudulent misrepresentation may be made as well by acts and conduct and arts or artifices calculated to deceive," and "fraud may be proved by circumstantial evidence."

Instructions Nos. 9 and 10, embracing Greensboro's theory of defense, read as follows:

(9). "The Court instructs the jury that if you believe that Paul Tompkins willfully concealed any material fact at the time the certificate here involved was issued for the purpose of securing such issuance, and that, had such fact been known to Harry T. Gladding, the certificate would not have been issued, then the said Paul Tompkins is guilty of fraud in the procurement of the same and you shall find your verdict for the defendant Greensboro National Life Insurance Company."

(10). "The Court instructs the jury that if you believe from the evidence that Paul Tompkins went to the George W. Daingerfield Agency on the occasion here in question and represented another woman in apparent good health as his wife, Nettie Tompkins, and if you further believe that this representation was relied

upon by Harry T. Gladding, agent for the defendant Greensboro National Life Insurance in issuing the said certificate, then the said Paul Tompkins is guilty of fraud in the procurement of the same and you shall find your verdict for the defendant Greensboro National Life Insurance Company."

Instruction No. 10 was based upon a finding of the fact that the plaintiff represented another woman to be his wife, and that this representation was relied upon by the agent in issuing the insurance. There was ample evidence for the jury to find that there was, in fact, no woman companion present with Tompkins when the insurance was issued, and consequently no representation as to her status was made by the plaintiff.

 Greensboro excepted to the granting of Instruction No. 6 and to the refusal to grant No. 10a.

Instruction No. 6 reads as follows:

"The Court instructs the jury that in order for *untrue answers* to be fraudulent they must be wilfully false and known to be untrue at the time they were made." [Emphasis added.]

This instruction refers only to "untrue answers." Since it is not claimed, nor does the record show, that any untrue answers were made at any time, the instruction was inapplicable to the facts of the case; and, under the circumstances, we do not believe that it was prejudicial to Greensboro.

There is no need here for a discussion of the differences between representations known to be false and representations actually untrue but believed to be correct, because of the absence of representations of any character.

The decisions are in conflict; but in Virginia, we have held in actions upon life insurance contracts that "Untrue answers, in order to be fraudulent, must be wilfully false." *South Atlantic Insurance Company* v. *Hurt*, 115 Va. 398, 405, 79 S. E. 401.

In *Williams* v. *Metropolitan Life Insurance Company*, 139 Va. 341, 345, 123 S. E. 509, we said that a life insurance company "cannot complain of a decedent's failure to answer questions which its examiner did not ask her."

*Gilley* v. *Union Life Insurance Company*, 194 Va. 966, 76 S. E. 2d 165, involved a life insurance policy secured by a woman on the life of her mother. The daughter honestly thought her mother was in good health, and so stated in her answers to questions when applying for insurance on the mother's life. The mother was, however, suffering from a malignant illness, of which the daughter was un-

aware. We held that the daughter was not precluded from recovery, if she did not know about the disease from which her mother suffered, and honestly believed her to be in sound health. 194 Va., *supra*, page 971.

Furthermore, we have repeatedly held in cases involving fire insurance policies that, if no inquiry was made by the insurer as to the status of the property, it cannot, after a loss has occurred, defeat recovery because the insured did not voluntarily make certain disclosures. *Union Assurance Society of London* v. *Nalls*, 101 Va. 613, 44 S. E. 896; *North River Insurance Company* v. *Lewis*, 137 Va. 322, 327, 119 S. E. 43.

■ We find no error in the refusal of the trial court to grant Instruction No. 10a. The instruction is based on the effect of a misrepresentation of a material fact with respect to the health of plaintiff's wife, and as we have stated hereinbefore there was no representation made with respect to the physical condition of Mrs. Tompkins.

Instruction No. 10, granted by the court, sets out the main contention of Greensboro in a light favorable to it.

Greensboro made a contract of insurance without requiring, or requesting, any information whatever relating to the health of the person insured. Its certificate of insurance contains no condition, limitation, or exception with respect to the health of the insured. Had Greensboro considered the health of the insured was material to the risk assumed, under the type of policy here issued, it could have required evidence of insurability, or a medical examination of the person to be insured, or a written application setting forth the physical condition of such person, or, at the least, it could have made an oral inquiry as to such fact. Here, it did none. It merely assumed, through its agent or agents, that a woman, alleged to be present with the plaintiff when the application for the insurance was made, was the wife of the plaintiff.

Greensboro accepted a premium of $55.41 for one year's coverage, a premium doubtlessly charged according to the risk assumed. Greensboro agreed that if the insured died within one year from the date of the issuance of the certificate, it would pay to Southside Bank the balance of the debt owed to the Bank by her and her husband, at the time of the insured's death. On the other hand, if the insured or her husband paid the debt in full during that first year, or if the insured lived beyond that period, Tompkins and his wife would be out of pocket $55.41. It was a calculated risk that

each party took. Greensboro lost, and it should now pay according to its contract.

The judgment of the trial court is affirmed.

*Affirmed.*