USLIFE CREDIT LIFE INSURANCE COMPANY, ET AL, *Respondents,* v. GERALD D. MCAFEE, ET AL, *Appellants,* COMMERCIAL BANK OF SEATTLE, ET AL, *Respondents.*

UNIGARD OLYMPIC LIFE INSURANCE COMPANY, *Respondent,* v. GERALD D. MCAFEE, ET AL, *Appellants,* BANK OF EVERETT, ET AL, *Respondents.*

COMMERCIAL BANKERS LIFE INSURANCE COMPANY, *Respondent,* v. GERALD D. MCAFEE, ET AL, *Appellants,* COMMERCIAL BANK OF SEATTLE, *Respondent.*

BANK OF EVERETT, *Respondent,* v. UNIGARD OLYMPIC LIFE INSURANCE COMPANY, *Respondent,* GERALD D. MCAFEE, *Appellant.*

RICHARD MARQUARDT, *Respondent,* v. GERALD D. MCAFEE, *Appellant,* BANK OF EVERETT, *Respondent.*

*Thom, Navoni, Hoff, Pierson & Ryder* and *George Schoonmaker,* for appellants.

*Thomas Zilly, Thomas Loftus, Jennings Felix, Lewis Bell, Kenneth Rice, Richard Derham, Harwood Bannister, Joseph Mijich, John World,* and *Richard Eadie,* for respondents.

ANDERSEN, J.—

FACTS OF CASE

Gerald D. McAfee, beneficiary of insurance on his late wife's life, appeals from a judgment rescinding certain insurance policies and certificates on her life on the basis of fraud.

McAfee, an insurance agent, learned that his wife was suffering from terminal cancer. Thereupon he bought a number of credit life insurance policies and certificates insuring her life (as well as his own) in insurance companies which did not require a good health statement or health information of any kind from prospective insureds. Two of the certificates were written in a company at a time when he was an insurance agent for the company.

Following a trial to the court, detailed findings of fact and conclusions of law were entered. In its findings, the trial court explained credit life insurance as follows:

Credit Life Insurance is life insurance issued on the life of the debtor. It is normally sold by a lending insti-

tution or a retail outlet. It requires that there be a valid debt, and that the debtor–insured has not reached his 65th birthday, and is generally issued up to the limits of between $12,500 and $15,000 without any medical questions or medical examination. The premium paid by the insured under a credit life policy is shared by the lending institution or retail outlet (which gets 40%) and the insurance carrier (which receives 60%). There would be no substantial cost or effort to credit life insurance carriers to have a written application include one question as to health which will allow complete protection to the carriers in the form of post–claim underwriting. A question of this type was in use at all material times in Washington by plaintiff Pacific Standard Life Insurance Company on its credit life insurance policies for amounts exceeding $15,000.

Finding of fact No. 33.

Between July 15, 1974 and February 21, 1975, Mr. and Mrs. McAfee were involved in a series of credit transactions, including vehicle leases, for which they obtained credit life insurance coverage. Premiums on this insurance were paid. Each policy was a joint level term policy under which payment was to be made on the death of either party. Mrs. McAfee died of cancer on June 30, 1975.

Most of the 17 transactions at issue in this case involved a loan of money by a bank to the McAfees, the immediate deposit by them of the loan proceeds in a blocked savings account in the same bank as security for the loan and their election of credit life insurance coverage on each loan transaction. Most of the credit life policies were group policies though a few were individual policies. One loan was covered by other collateral and there were three vehicle leases with credit life insurance coverage. Insurance totaling $188,459 was involved in the 17 policies here in issue.

Essentially it was the trial court's conclusion in this case that McAfee had a duty to disclose his wife's terminal illness at the time he purchased the credit life insurance policies and certificates and his failure to do so constituted fraud. On this basis, the monies paid to Mr. McAfee by one insurer were ordered repaid and he was denied the right to

recover from the other insurers.

This appeal presents two principal issues.

## ISSUES

ISSUE ONE. Does an applicant for life insurance have a duty to volunteer information to the insurer concerning the applicant's poor health?

ISSUE TWO. Where the applicant for life insurance is at the time an agent for the life insurance company to which application is made, does the applicant in that case have a duty to volunteer information concerning poor health to the prospective insurer?

## DECISION

ISSUE ONE.

CONCLUSION. Absent an insurer's request for health information or a statement of good health, a prospective insured is under no duty to volunteer it.

It is the general rule that "when the insurer asks no information in regard to a certain matter, it is a fair assumption that it regards the matter as immaterial." 43 Am. Jur. 2d *Insurance* § 730, at 717 (1969). *Accord,* 45 C.J.S. *Insurance* § 473(3), at 153 (1946). While it might seem facetious to presume that a life insurer would regard a prospective insured's terminal illness as immaterial, it is not unreasonable to assume that a life insurer which does no underwriting of the risks it insures expects a certain percentage of such poor risks and has adjusted its premiums to compensate for insuring them. Indeed where, as here, the insurers insured any debtor up to age 65 who paid a premium (whether that person was personally seen by the agent or not), and where the premium is the same for everybody regardless of age or health, no other conclusion seems reasonable. Furthermore, it cannot be deemed particularly surprising that a person in poor health would seek out insurance companies that see fit to write life (or health) insurance without having good health requirements of some kind.

Here the trial court's findings are silent as to any health

inquiries having been made to the insureds. Numerous authorities stand for the proposition succinctly stated in *Graham v. Aetna Ins. Co.,* 243 S.C. 108, 113, 132 S.E.2d 273, 275, 100 A.L.R.2d 1352 (1963):

> Mere silence on the part of the assured as to a matter not inquired of is not to be considered such a concealment as to avoid the policy. *Aliud est celare, aliud tacere.*

*See* 9 G. Couch, *Insurance* § 38:72 (2d ed. 1962); 12 J. Appleman, *Insurance* § 7276 (1943); 43 Am. Jur. 2d *Insurance* § 731 (1969).

In upholding coverage under a group insurance policy issued to a quadriplegic who died 14 months after his certificate was written, the Supreme Court of Wisconsin quoted with approval from 9 G. Couch, *Insurance* § 38:58 (2d ed. 1962):

> "The insured is not obligated to volunteer statements of every circumstance which anybody may subsequently deem important as affecting the risk upon his life, for it is requisite only that he answer all questions truly, make no untrue statements, and submit himself to a full examination."

*Southard v. Occidental Life Ins. Co.,* 31 Wis. 2d 351, 359, 142 N.W.2d 844, 848 (1966).

A credit life insurance case in point is *Greensboro Nat'l Life Ins. Co. v. Southside Bank,* 206 Va. 263, 142 S.E.2d 551 (1965). In that case, as here, an insurer at the request of a husband issued a credit life insurance certificate on the wife's life without requiring or requesting any information as to her health. After she died, payment was denied by the insurer, Greensboro National Life Insurance Company, and suit was brought. The Supreme Court of Appeals of Virginia ruled that a life insurance company could not complain of a decedent's failure to answer questions which were never asked. In affirming a judgment against the insurer it stated:

> Greensboro made a contract of insurance without requiring, or requesting, any information whatever relating to the health of the person insured. Its certificate of

insurance contains no condition, limitation, or exception with respect to the health of the insured. Had Greensboro considered the health of the insured was material to the risk assumed, under the type of policy here issued, it could have required evidence of insurability, or a medical examination of the person to be insured, or a written application setting forth the physical condition of such person, . . .

*Greensboro,* 206 Va. at 269, 142 S.E.2d at 555.

Similarly, in the credit life case of *First Federated Life Ins. Co. v. Citizens Bank & Trust Co.,* 593 S.W.2d 97, 99 (Ky. Ct. App. 1979), it was held:

Insofar as appellant required no statement of health condition, examination or application, it should therefore bear the greater of the risks of the debtor, being of unsound health at the time of issuance of the credit life policy. The policy of insurance issued in this case was absent a requirement as to the condition of health at the time of the delivery, absent a requirement for furnishing satisfactory evidence of insurability, and there is no policy provision affecting the validity of the policy in the event the insured was of unsound health at time the policy was issued.

Another instructive credit life insurance decision is *Sellner v. Cuna Mut. Ins. Soc'y,* 288 Minn. 408, 181 N.W.2d 342 (1970). In upholding the validity of the policy against the insurer's claim of fraud, the Supreme Court of Minnesota concluded:

It may well be, as the trial court suspected, that decedent used the mechanics of the loan transaction to procure additional insurance, but we do not think that this circumstance, if true, invalidated either contract. If the insurance company, by its arrangement with the credit union, chose to make this protection available to members without express qualifications other than those recited, we find no reason why decedent should not properly take advantage of it.

*Sellner v. Cuna Mut. Ins. Soc'y,* 288 Minn. at 411, 181 N.W.2d at 344.

*Greensboro, First Federated* and *Sellner* state the prevailing view in credit life insurance cases where no inquiry

has been made concerning the state of the applicant's health. A different view, however, was adopted in *National Life Ins. Co. v. Harriott,* 268 So. 2d 397 (Fla. Dist. Ct. App. 1972), which is relied upon by the insurers in this case. *Harriott,* at page 399 holds: "where a purchaser acquires a valuable article and finances it in a transaction secured by credit life insurance under motivation of knowledge that the person whose life is insured, unseen by the lender, is reasonably certain soon to die, a duty to disclose the impending death of the insured arises." Although the legislature is free to write such a provision into this state's insurance code, the courts are not. *See Aetna Life Ins. Co. v. Washington Life & Disability Ins. Guar. Ass'n,* 83 Wn.2d 523, 528, 520 P.2d 162 (1974). The holding in *Harriott* is based on a Florida statute (Fla. Stat. Ann. § 627.409 (West)) materially different from any in this state and is contrary to provisions of this state's insurance code discussed below. We therefore do not adopt the holding in *Harriott.*

Three sections of this state's insurance code are directly pertinent to the issue before us.

One section which pertains specifically to credit life policies and certificates required that a description of the coverage, including the amount and terms thereof, be set out in such policies and certificates along with any exceptions, limitations and restrictions thereto. RCW 48.34.090(2). No health exceptions, limitations or restrictions were set out in any of the policies and certificates in this case.

Another section of the insurance code which pertains to group life insurance (as most of the policies and certificates were in this case) required the insurers to state any conditions under which they reserved the right to require evidence of individual insurability, RCW 48.24.140, and if such evidence was required, provided that it had to appear in a written statement signed by the insured or else it could not be used to contest the validity of the insurance, RCW 48.24.120. No such conditions were stated in the group policies and certificates before us and no signed health

statements were requested or given.

Based on the reciprocal obligations of insured and insurer to act in good faith, RCW 48.01.030,[1] the insurers in effect ask that we declare that there is a legal obligation on all life insurance applicants to fully disclose the state of their health to a prospective insurer when the insurer makes no inquiry concerning it.

While the adoption of such a principle might impart a semblance of fairness in a case as unsympathetic appearing as this one, where the husband obtained 17 credit life insurance policies and certificates (totaling $188,459) on his wife's life after learning of her terminal illness, it would, in fact, establish a precedent destructive of much of the insurance consumer protective legislation that has been adopted in this state. Some of these protective statutes are discussed above. Others provide, for example, that insurance applications cannot be admitted in evidence unless attached to the policies so the insured will be sure to see them, RCW 48.18.080, and that no representation by an insured will defeat coverage under a policy unless the representation is material and made with an intent to deceive, RCW 48.18.090.

In short, to impose a duty on every insurance applicant to fully disclose the state of his or her health where the insurer does not request that information would be to build a trap for all purchasers of life and health insurance. Such a holding would be precedent allowing any life or health insurer so inclined, whenever a claim is presented, to use the 20–20 vision of hindsight to seek out prior health problems in order to try and defeat the claim. That is precisely the kind of postclaim underwriting which the statutes herein discussed were designed to prevent. *See* RCW 48.18.080–.090; RCW 48.24.120; RCW 48.24.140; RCW

---

[1] "Public interest. The business of insurance is one affected by the public interest, requiring that all persons be actuated by good faith, abstain from deception, and practice honesty and equity in all insurance matters. Upon the insurer, the insured, and their representatives rests the duty of preserving inviolate the integrity of insurance." RCW 48.01.030.

48.34.090(2). An insured has the right to have any application or health statement before him or her in order to review or correct it, if necessary, *Lundmark v. Mutual of Omaha Ins. Co.,* 80 Wn.2d 804, 807, 498 P.2d 867 (1972); and an insurer must require evidence of insurability before the insured's death, not after, *Ryan v. Cuna Mut. Ins. Soc'y,* 84 Wn.2d 612, 615–16, 529 P.2d 7 (1974).

Based on the foregoing principles, and on the credit life insurance policies and certificates in question, we conclude that absent a request for health information or a statement of good health by an insurer, the insured has no duty to provide it. There was no request for such information here, therefore, Mr. and Mrs. McAfee were under no duty to provide it. It follows that the McAfees' failure to provide such health information to the insurers cannot be deemed fraudulent.

Issue Two.

Conclusion. When the prospective insured or beneficiary is an agent for the insurer at the time the insurance is written, the agency relationship imposes an affirmative duty on the agent to provide full health particulars to that insurer.

Where, as here, the agent for an insurer was also the prospective insured (and beneficiary) and helped place two credit life insurance certificates with that insurer, then the agent did owe a duty to the insurer to provide full health particulars concerning those two certificates whether he was requested to do so or not. That obligation arises out of the agent–principal relationship and not out of the insured–insurer relationship or the contract of insurance.

Having full and exclusive knowledge of the risk involved regarding these two Unigard certificates, namely the insurance risk posed by his wife's terminal illness, Mr. McAfee, as the agent, owed the utmost degree of good faith to his principal (Unigard) and was thereby obligated to fully inform Unigard of the illness. *Ingram v. Fidelity–Phoenix Fire Ins. Co.,* 16 F.2d 251, 252 (8th Cir. 1926); *Westchester Fire Ins. Co. v. Fitzpatrick,* 2 F.2d 651, 654 (3d Cir. 1924);

*Harrison State Bank v. United States Fidelity & Guar. Co.,* 94 Mont. 100, 108, 22 P.2d 1061, 1064 (1933); *Martinek v. Firemen's Ins. Co.,* 247 Mich. 188, 225 N.W. 527 (1929); *Pedersen v. Life of Mid–America Ins. Co.,* 164 N.W.2d 337, 345 (Iowa 1969); *Shinpaugh v. Midwest Life Ins. Co.,* 32 Ill. App. 2d 207, 177 N.E.2d 426, 429 (1961). This failure to inform can constitute fraud. *See Westchester Fire Ins. Co. v. Fitzpatrick, supra;* 16 J. Appleman, *Insurance* § 8737 (1981). Thus the trial court was justified in rescinding the two Unigard certificates in question and awarding Unigard the money judgment in connection therewith that it did.

The insurers' arguments on cross appeal that the trial court erred in not considering certain statements by Mr. McAfee, which were admitted in evidence over his objection (but not considered by the trial court) are not well taken. Since the statements were not in writing and attached to the insurance policies or certificates, their consideration was precluded. RCW 48.24.120–.130.

The remaining contentions of the parties in connection with the appeal and cross appeal are either encompassed in our ruling herein or are considered nonmeritorious.

Unigard Olympic Life Insurance Company's money judgment and the judgment rescinding its credit life insurance certificates Nos. 896035 and 919070 are affirmed and the remaining portions of the judgment and supplemental judgment are reversed.

RINGOLD, A.C.J., and DURHAM, J., concur.

Reconsideration denied November 13, 1981.

Review denied by Supreme Court March 3, 1982.