7 P.3d 852 (2000)
Eleanor ABBOTT, a single person, Appellant,
v.
CUNA MUTUAL INSURANCE SOCIETY; and Educational Employees Credit Union, Respondents,
Eleanor Abbott, a single person; and Diane Baillargeon, Personal Representative of the Estate of Larry Ketchum, deceased, Appellants,
v.
Cuna Mutual Insurance Society; and Kitsap Federal Credit Union, Respondents.
No. 24103-0-II.
Court of Appeals of Washington, Division 2.
September 8, 2000.
*853 Gregory Mann Miller, Seattle, for Amicus Curiae Washington State Medical Association.
John Raymond Ruhl, Eisenhower & Carlson, Seattle, for Respondents.
Nick L. Markovich, Gig Harbor, for Appellants.
MORGAN, J.
Eleanor Abbott (Abbott) and Larry Ketchum's estate (Ketchum)[1] sued two credit unions and a credit life insurer to collect credit life insurance written on the life of Fred Epperly. After a bench trial, the trial court ruled for the defendants. We affirm.
In 1990, Eleanor Abbott was a licensed practical nurse. She operated a licensed adult foster care facility in her home.[2] One of her neighbors was Larry Ketchum. One of her patients was Fred Epperly.
Epperly had been severely injured in an on-the-job accident. He was quadriplegic and needed 24-hour-a-day care. Abbott provided such care in exchange for $15,000 per month from the Washington State Department of Labor and Industries (DLI). Epperly had no income, although DLI was paying $1,400 per month to his wife and children. Epperly could sign his name by using a mouthwand.
Epperly, Abbott and Ketchum were not related by blood or law. According to Abbott's brief on appeal, she and Epperly had "developed ... a close friendship." According to Ketchum's brief on appeal, he and Epperly had "also developed a friendship."[3]
On December 4, 1990, Abbott and Epperly opened a joint account at the Educational Employees' Credit Union (EECU). During the next three months, Abbott deposited approximately $149,000 of her own money into that account. Epperly deposited nothing.
On March 13, 1991, EECU made five loans totaling $149,000. Four loans were for $30,000, and one was for $29,000. All five were secured by the contents of the Abbott-Epperly joint account. The transaction was structured as five smaller loans, instead of one larger loan, so that Abbott and Epperly could obtain joint credit life insurance. Peculiarly, the insurer they proposed to use, CUNA Mutual Insurance Society (CUNA), was willing to insure five smaller loans totaling $149,000, but unwilling to insure one larger loan for the same amount.
Both Abbott and Epperly signed the loan documents. Thus, they became joint obligors of the credit union.[4]
As between themselves, according to the trial court's appropriate findings of fact, Abbott was intended to be the primary obligor and Epperly was intended to be the secondary obligor (i.e., surety or accommodation maker).[5] In accordance with this intent, Abbott *854 took all of the loan proceeds. According to her later testimony, she spent the entire $149,000 for "everyday expenses and bills and that sort of thing."[6]
Also on March 13, 1991, Abbott and Epperly applied to CUNA for joint credit life insurance in the amount of the five loans. CUNA accepted the application and issued a certificate of insurance. EECU paid the premium out of the loan proceeds. CUNA's insurance policy provided that for "single life coverage," the borrower is insured, and that for "joint life coverage," the co-borrower is also insured.[7] It further provided that "[i]f a member or a joint insured dies while he is insured under this Policy for a loan, [CUNA] will pay the principal balance of his loan on the date of his death...."[8] Finally, it provided that:
Any death benefits under this Policy will be paid to [the lending credit union].... [The lending credit union] will apply the benefits to reduce or pay off the loans for which payment is made. Any excess benefits will be paid by [CUNA] by separate check to the beneficiary named to the estate. [The lending credit union] will pay any excess benefits to the beneficiary named by him or to his estate.[[9]]
Epperly did not name a beneficiary other than his estate.
Four months later, Abbott, Ketchum and Epperly engaged in two similar transactions at the Kitsap Federal Credit Union (KFCU). On or about July 25, 1991, Abbott and Epperly opened a joint account at KFCU. Within a few days, Abbott deposited $50,000 of her own money. On August 8, 1991, KFCU loaned $50,000, taking the contents of the joint account as security. Both Abbott and Epperly signed the loan documents, thus becoming joint obligors of the credit union. As between themselves, however, Abbott was intended to be the primary obligor and Epperly the secondary obligor (i.e., surety or accommodation maker).[10] Consistent with this intent, Abbott took all the loan proceeds in the same way as before.
Also on August 8, Abbott and Epperly applied for joint credit life insurance in the amount of the KFCU loan. CUNA agreed to insure under a policy identical to the one described above, and Epperly did not name a beneficiary other than his estate.
Meanwhile, on July 26, 1991, Ketchum and Epperly opened another joint account at KFCU. On August 9, 1991, Abbott deposited into the Ketchum-Epperly account the $50,000 she had borrowed from KFCU the previous day, and KFCU loaned another $50,000, secured by the contents of the Ketchum-Epperly account. Ketchum signed the loan documents and took all the proceeds. They tried to purchase a backhoe, but they returned it. Although it is unclear whether Epperly also signed the loan documents, we will assume that he did,[11] and that he and Ketchum became joint obligors of the credit union. As between themselves, however, Ketchum was intended to be the primary obligor and Epperly the secondary obligor (i.e., surety or accommodation maker).[12]
Also on August 9, Ketchum and Epperly applied to CUNA for joint credit life insurance in the amount of the loan. CUNA agreed to insure under a policy identical to the one described above, and Epperly did not name a beneficiary other than his estate.
*855 During the remainder of August 1991, Abbott and others engaged in several more transactions. The others, according to Abbott's testimony, included her daughter Diane; her friend Karen Boyd; and her daughter's friend Karen Byron. On August 16, 1991, Boyd and Epperly obtained a $50,000 loan from a credit union, and probably joint credit life insurance also.[13] On August 18, 1991, Abbott and Epperly bought a $30,000 Toyota Cressida and joint credit life insurance. Also on August 18, Epperly gave Abbott a power of attorney. On August 18, Byron and Epperly (with Abbott now signing for Epperly under the power of attorney) bought a $15,000 Toyota Corolla and joint credit life insurance. On August 19, Diane and Epperly (with Abbott again signing for Epperly under the power of attorney) bought a $15,000 Toyota truck and joint credit life insurance. On August 28, 1991, Abbott and Epperly obtained a $40,000 loan from a bank, and credit life insurance also.[14] On August 30, 1991, Abbott and Epperly purchased a $50,000 BMW and joint credit life insurance. None of these transactions involved CUNA, EECU or KFCU, so none is directly in issue here.
On August 31, 1991, Epperly died. Two weeks later, Abbott asked EECU and KFCU to claim against CUNA and use the proceeds to pay off the loans on which she was a joint obligor. Ketchum made a similar request to KFCU. Each credit union claimed as requested, but EECU also notified CUNA that "[t]here are unusual circumstances surrounding this claim."[15] On December 31, 1991, CUNA denied the claims, stating that "there is no coverage."[16]
After CUNA's denial, EECU and KFCU satisfied their loans by taking money out of the joint accounts that had been pledged as security. Since then, of course, neither credit union has claimed against CUNA. Nor has Epperly's estate. But Abbott and Ketchum have.
On December 15, 1995, Abbott sued CUNA and EECU. In December 1997, Abbott and Ketchum sued CUNA and KFCU. The two lawsuits were consolidated, a bench trial was held, and the defendants prevailed. Abbott and Ketchum then filed this appeal.
Credit life insurance is insurance on the life of the debtor, not insurance on a debt. RCW 48.34.030(1) states that credit life insurance is "insurance on the life of the debtor pursuant to or in connection with a specific loan or other credit transaction."[17]Leuning v. Hill states "that it is the life of the debtor which is insured, rather than the debt."[18] CUNA's policy states that "for single life coverage" the borrower is insured, and "for joint life coverage" the co-borrower is also insured.[19]
Generally, the amount of credit life insurance declines as the balance due on the debt declines. According to Couch, "Credit... Life policies are common forms of decreasing term coverage, in which coverage is for the duration of the note[.]"[20] According to RCW 48.34.060, "[t]he initial amount of credit life insurance under a group policy shall at no time exceed the amount owed by the debtor which is repayable in installments to the creditor."[21] According to RCW 48.34.050, "[t]he initial amount of credit life insurance under an individual policy shall not exceed the total amount repayable under *856 the contract of indebtedness[,]" and that "[w]here an indebtedness is repayable in substantially equal installments, the amount of insurance shall at no time exceed the scheduled or actual amount of unpaid indebtedness, whichever is greater." In Leuning v. Hill, however, particular group policies were said to be "nonreducing term policies."[22]
Even if the amount of credit life insurance declines while the insured is alive, it becomes fixed when the insured dies, at least for purposes of this case. Couch states that "the amount payable in the event of the death of the insured is the amount of debt outstanding at that time."[23] The CUNA policy in issue here states that "[i]f a member or a joint insured dies while he is insured under this Policy for a loan, we will pay the principal balance of his loan on the date of his death[.]"[24]
Because the credit life insurer's obligation becomes fixed when the insured dies, an alternate beneficiary is needed. The primary beneficiary is the creditor. Instead of claiming against the insurance proceeds, however, the creditor may choose to satisfy its loan from other sources (e.g., the joint accounts held as security in this case). If the creditor chooses to do that, it will not be entitled to the credit life proceeds, and the insurer must pay those proceeds to an alternate beneficiary.
In Washington, both RCW 48.34.090(2) and Leuning v. Hill recognize this need for an alternate beneficiary. RCW 48.34.090(2) mandates that "[e]ach individual policy or group certificate of credit life insurance ... shall state that the benefits shall be paid to the creditor to reduce or extinguish the unpaid indebtedness and, wherever the amount of insurance exceeds the unpaid indebtedness, that any such excess shall be payable to a beneficiary, other than the creditor, named by the debtor or to the debtor's estate." In Leuning v. Hill, the credit life insurer owed $15,000 to someone, but only $10,097 to the lender as primary beneficiary. Thus, the insurer paid $4,903 to the insured debtor's estate.[25] Cases from other jurisdictions are in accord.[26]
As mandated by RCW 48.34.090(2), the CUNA policy in issue here provided for both primary and alternate beneficiaries. It stated that CUNA would pay the lending credit union, and that the lending credit union "will apply the benefits to reduce or pay off the loans for which payment is made." It further stated that "[a]ny excess benefits will be paid by [CUNA] by separate check to the beneficiary named to the estate," or, if CUNA had already paid the lending credit union, that the lending credit union "will pay any excess benefits to the beneficiary named by him or to his estate."[[27]]
As noted above, Epperly did not name an alternate beneficiary other than his estate. Thus, his primary beneficiary was each lending credit union, and his alternate beneficiary was his estate. When he died, CUNA's obligation, if any, was to pay the insurance proceeds to each credit union as a primary beneficiary, with any excess going to his estate. After each credit union chose to satisfy its loans from other assets (i.e., from the joint accounts taken as security), the *857 proceeds were all excess, and CUNA's obligation, if any, was to pay them to Epperly's estate. CUNA never had, and does not now have, an obligation to pay either Abbott or Ketchum.
We confirm this result by looking beyond Epperly's insurance beneficiaries, and examining the respective rights of Abbott, Ketchum, and Epperly. In Leuning v. Hill, Leuning leased a farm to Hill. The lease obligated Hill to pay all farming expenses. When a crop loan was needed, they jointly signed a note to a lender and bought joint credit life insurance. When Leuning died, the amount remaining on the note was $10,097. The credit life insurer paid that amount to the lender, thus discharging the debt. Leuning's estate then claimed that Hill should have paid the lender; that it (the estate) should have received the $10,097 in credit life insurance proceeds; and that it should be reimbursed by Hill in the amount of $10,097. The Supreme Court held, in effect, that a deceased debtor's credit life insurance is supposed to pay the debt to the extent that the insured debtor owes it. The deceased debtor's insurance is not supposed to pay the debt to the extent that someone else owes it. Although Hill and Leuning were jointly obligated to the lender based on the note they jointly signed for the lender, between themselves they were primary and secondary obligor, respectively, based on the lease. Therefore, Hill should have paid the entire debt; the estate should have received the $10,097; and Hill was required to reimburse the estate for that amount.
Leuning's lessons apply here. Epperly's credit life insurance was supposed to pay the credit union loans insofar as he owed them. It was not supposed to pay the credit union loans insofar as Abbott or Ketchum owed them. Although Epperly and Abbott (or, in Ketchum's case, Epperly and Ketchum) were joint obligors to the credit unions, they were, as between themselves, primary and secondary obligor respectively. Consequently, Abbott and Ketchum should pay all that was owed to the credit unions (which they did when the credit unions took the contents of the joint accounts), and Epperly's estate should receive all of his credit life insurance.
The parties debate whether CUNA is estopped from denying coverage, but the question is immaterial. Whether or not CUNA is estopped from denying coverage, it is not estopped from denying payment to a claimant who is not a beneficiary.
The parties debate whether Abbott or Epperly (or, in Ketchum's case, Ketchum or Epperly) purchased the insurance on Epperly's life. Again, however, the question is immaterial. Whoever purchased the insurance did not name Abbott or Ketchum as a beneficiary; and if neither Abbott nor Ketchum is a beneficiary, neither can collect the proceeds at issue here.
The parties debate whether Abbott and Ketchum had insurable interests in Epperly's life, but again the question is immaterial. Given that neither was a beneficiary, neither can collect anyway.
We reject CUNA's assertion that the insurance was void ab initio due to RCW 48.18.030(1). RCW 48.18.030(1) provides:

Any individual of competent legal capacity may procure or effect an insurance contract upon his own life or body for the benefit of any person. But no person shall procure or cause to be procured any insurance contract upon the life or body of another individual unless the benefits under such contract are payable to the individual insured or his personal representatives, or to a person having, at the time when such contract was made, an insurable interest in the individual insured.
(Emphasis added.) If Epperly procured the insurance, the italicized language applied and the statute was satisfied.[28] If Abbott or Ketchum procured the insurance, the underlined language applied and the statute was again satisfied; each credit union had an insurable interest to the extent of its unpaid loans,[29] and Epperly's estate did not need an *858 insurable interest.[30]
The concurrence asserts that "Abbott and Ketchum were intended to be the actual beneficiaries of the insurance[.]"[31] This assertion is contrary to the plain language of the policy, which unambiguously states that the credit union is the primary beneficiary and Epperly's estate is the secondary beneficiary. Expressing the same idea in a different way, we do not believe it proper to determine an insurance beneficiary from the totality of circumstances, rather than from unambiguous policy language.[32]
The concurrence asserts that "neither [Abbott nor Ketchum] had an insurable interest in Epperly's life."[33] That is true. It is also immaterial under the plain language of RCW 48.18.030(1). That statute provides that when one person buys an insurance contract on the life of another, a beneficiary of the contract, other than the insured or the insured's estate, must have an insurable interest.
The concurrence questions "whether the credit union had an insurable interest in Epperly's life."[34] It seems to reason that when a lender takes two forms of security, one of which is life insurance and either of which is adequate to secure the lender's risk, the lender somehow forfeits an insurable interest that it otherwise would have. In our view, that simply is not the law.
Most fundamentally, the concurrence asserts that we fail "to deal with the wagering temptation inherent in [Abbott and Kethcum's] scheme."[35] That is true, but only for two reasons: (a) the plain language of RCW 48.18.030(1), and (b) the plain language of the policy for which CUNA chose to accept a premium. Amending the statute is a task for the legislature, not for any of the judges of this court; and exercising a higher level of care in the sale of credit life insurance is a task for CUNA and similar insurers.[36]
CUNA and amicus curiae[37] ask us to hold, based on public policy not previously recognized, that whenever a health care provider insures the life of a patient for whom the provider is caring, the insurance is automatically void ab initio. As we have just pointed out, that request should be addressed to the legislature.
In conclusion, Epperly's credit life insurance was not enforceable by Abbott and Ketchum, the only plaintiffs here. Thus, the trial court properly dismissed the complaints with prejudice.
Affirmed.
HOUGHTON, J., concurs.
ARMSTRONG, C.J. (concurring).
I concur with the result reached by the majority. I write separately because I disagree with the majority's reasoning. I would hold that the attempts by Abbott and Ketchum to purchase insurance on the life of Epperly are void because neither had an insurable interest in Epperly's life. And, because Abbott and Ketchum were intended to be the actual beneficiaries of the insurance, the fact that each credit union may, in theory, have had an insurable interest does not save the transactions. For simplicity, I will discuss only Abbott's transaction with *859 the Educational Employees Credit Union; the other transactions are similarly flawed.
The majority rejects CUNA's argument that the transaction is void because Abbott had no insurable interest in Epperly's life. Rather, the majority concludes that the transaction is valid, reasoning that the Credit Union, as a creditor of Epperly, had an insurable interest in his life. The only problem, according to the majority, is that the wrong party is claiming the benefits of the insurance. Thus, if the Credit Union claimed the insurance proceeds, CUNA would be liable.[38]
This reasoning ignores the economic reality of the transaction. If the Credit Union did collect the insurance proceeds, it would be required by statute to use the funds to pay off Abbott's loans.[39] But the benefit to the Credit Union would be either minimal or non-existent.
The Credit Union had no risk of loss because Abbott used her credit union account of $149,000 as collateral for the five loans totaling $149,008.40. In contrast, the indirect benefit to Abbott would be enormous: she would realize $149,000, less any interest and principal paid on the loans and premiums paid for the credit life insurance.[40]
The law requires an insurable interest for at least two reasons: (1) to prevent gambling on another's life, Washington State Public Employees' Board v. Cook, 88 Wash.2d 200, 204, 559 P.2d 991 (1977), and (2) to avoid the risk that persons might purchase insurance without an insurable interest and then intentionally destroy lives or property, Gossett v. Farmers Ins. Co., 133 Wash.2d 954, 969, 948 P.2d 1264 (1997). Abbott's scheme violated the first policy reason[41] and created at least the appearance of a conflict of interest as to the second.
Whether the insurance was of any benefit to the Credit Union is closely related to the question of whether the Credit Union had an insurable interest in Epperly's life. The Credit Union had such an insurable interest *860 if it had "a lawful and substantial economic interest in having the life ... of the individual insured continue." RCW 48.18.030(3)(b). And, while a creditor-debtor relationship may in general provide the creditor with an insurable interest in the life of the debtor, it does so only if the risk of loss on the loan is increased by the death of the debtor.[42] Under the peculiar circumstances of Abbott's loan, the Credit Union had no risk either before or after Epperly's death.
Abbott's peculiar circumstances are as follows. Abbott deposited all of the funds in the account. She then took five small loans in the full amount of the account (life insurance could not be purchased on one large loan), pledging the account as collateral. She added Epperly's name to the account, and Epperly signed the promissory notes on the loans. To conclude the transaction, Abbott purchased credit life insurance on Epperly's life. Abbott used the loan proceeds to remodel her house and pay bills.
Epperly was a quadriplegic on a ventilator, who required 24-hour care. He received $1,400 per month, which was paid directly to his wife. The State paid Abbott $500 per day to care for him. The trial court found that Epperly received no proceeds or benefit from the loans, and there is no evidence that he did or could have made any payments on the loans. The trial court also found that Abbott was the primary obligor on the promissory notes.
In theory, it is possible to argue that the Credit Union was at greater risk on the loans by the death of Epperly, the secondary obligor; in reality it was not. The Credit Union was completely secure on the loans by Abbott's pledge of her account proceeds. If a payment was not made, the bank could simply deduct the amount due from the account. Under these circumstances, I question whether the Credit Union had any insurable interest in Epperly's life.
More importantly, it is beyond dispute that the actual beneficiary of the insurance was intended to be Abbott. Although the proceeds of the policy were payable to the Credit Union, it was required to pay off Abbott's loan with the proceeds. And, if the Credit Union was never at risk on the loan, no benefit accrued to it from the payoff. Abbott, on the other hand, would have been $149,000 ahead, less principal, interest, and premiums paid. Under these circumstances, we should require the true beneficiary of the loanAbbottto have an insurable interest in the life insured.
As the court recognized in Leuning v. Hill, 79 Wash.2d 396, 404, 486 P.2d 87 (1971), allowing the primary obligor to avoid her obligation for the indebtedness, at the expense of the insured's death, would indirectly make her a beneficiary under the insurance policy. This results in unjust enrichment of the primary obligor and, in Leuning, entitled the estate of the surety to reimbursement. Leuning, 79 Wash.2d at 405, 486 P.2d 87. There, a true surety relationship existed. And, the surety purchased credit life insurance on his own life to protect his wife and estate in the event of default by the primary obligor. Leuning, 79 Wash.2d at 402, 486 P.2d 87. Here, Abbott purchased the insurance on Epperly's life not to protect against default, but to gain from Epperly's death.
Clearly, Abbott's attempt to purchase insurance is a wager contract. By validating the transaction, the majority allows Abbott to potentially benefit from the insurance on Epperly's life. Although Epperly's estate may, if it knows of the transaction, have a claim against Abbott for reimbursement, this is far from clear. Leuning is significantly different, because it involved a real debt with real risk of loss to the surety. And, the surety in Leuning obtained the insurance on his own life to protect his estate from the risk of loss. Leuning, 79 Wash.2d at 402, 486 P.2d 87. Most importantly, by validating Abbott's purchase of insurance on Epperly's life, the majority fails to deal with the wagering temptation inherent in the scheme.
In the context of life insurance, the insurable interest rule is designed to protect human *861 life. See 3 LEE R. RUSS & THOMAS F. SEGALLA, COUCH ON INSURANCE § 41:17 (3d ed.1995). Abbott had no insurable interest in the life of Epperly. Her attempted purchase of insurance on his life was a gambling transactionthe very evil proscribed by the insurable interest doctrine. I would, therefore, hold the transaction void.
NOTES
[1] Ketchum died in 1994. His sister, Diane Baillargeon, is his personal representative. We use "Ketchum" to denominate both him and his estate.
[2] See RCW 70.128 and WAC 338-76.
[3] Br. of Appellant at 13.
[4] Leuning v. Hill, 79 Wash.2d 396, 400, 486 P.2d 87 (1971); Holland v. Tjosevig, 109 Wash. 142, 144, 186 P. 317 (1919); Smith v. Doty, 91 Wash. 315, 322, 157 P. 881 (1916).
[5] See Findings of Fact 1.9, 1.28, 1.31, Conclusion of Law 2.15 (Clerk's Papers at 31, 32, 37); see also Leuning, 79 Wash.2d at 400, 486 P.2d 87 ("[W]hile comakers to a written promissory obligation may sign and appear on the face of the writing as principals, they may in fact, as between themselves, occupy the relation of principal and surety, and, as between themselves, their true relationship may be established by parol or circumstantial evidence."); Holland, 109 Wash. at 144, 186 P. 317 ("[T]he rule is that, as between the makers of a note and the holder, all are alike liable, all are principals, but that, between themselves, their rights depend upon other questions, and these rights may be determined by oral testimony."). Abbott and Ketchum assign error to the trial court's findings, but as CUNA correctly points out, they abandon their assignments by failing to provide reasoned argument or authority. In re Lint, 135 Wash.2d 518, 531-32, 957 P.2d 755 (1998); State v. Motherwell, 114 Wash.2d 353, 358 n. 3, 788 P.2d 1066 (1990). And, even if they were maintaining their assignments, we would review only for substantial evidence, Fisher Properties, Inc. v. Arden-Mayfair, Inc., 115 Wash.2d 364, 369, 798 P.2d 799 (1990); Professionals 100 v. Prestige Realty, Inc., 80 Wash.App. 833, 842, 911 P.2d 1358 (1996), which surely exists here. See Hendel v. Medley, 66 Wash.App. 896, 900, 833 P.2d 448 (1992) (absence of benefit to a party is evidence that he or she is intended to be accommodation party); RCW 62A.3-419 cmt.3 (accommodation party is a surety).
[6] Report of Proceedings at 87.
[7] Br. of Appellant, Appendix A (policy page 4).
[8] Br. of Appellant, Appendix A (policy page 4).
[9] Br. of Appellant, Appendix A (policy pages 1 and 4).
[10] This is according to the trial court's findings and conclusions. See Findings of Fact 1.17, 1.28, 1.31, Conclusion of Law 2.15 (Clerk's Papers at 31, 32, 37). See also note 5.
[11] Because the parties have supplied the court with many documents that are copied illegibly, it is impossible to tell whether Epperly did or did not sign a promise to pay in the transaction with Ketchum. We will assume he did, for it makes no difference to the outcome of the case.
[12] This is according to the trial court's findings and conclusions. See Findings of Fact 1.17, 1.28, 1.31, Conclusion of Law 2.15 (Clerk's Papers at 31, 32, 37). See also note 5.
[13] The record is not clear on whether they obtained insurance, although Abbott implied that they did. Report of Proceedings at 70-73. See also Exhibit 28.
[14] The record is not clear on whether they obtained insurance, although Abbott implied that they did. Report of Proceedings at 69. See also Exhibit 28.
[15] Exhibit 9 (pp. 1301, 1313, 1329, 1336, 1347).
[16] Exhibits 12 and 13.
[17] Emphasis added.
[18] Leuning, 79 Wash.2d at 401-02, 486 P.2d 87 (citing Betts v. Brown, 219 Ga. 782, 136 S.E.2d 365, 368 (1964)).
[19] Br. of Appellant, Appendix A (policy page 4). In their brief on appeal, Abbott and Ketchum claim that "Cuna Mutual insured repayment of loans, nothing else." Br. of Appellant at 22. As the main text demonstrates, this is wrong.
[20] 1 LEE R. RUSS & THOMAS F. SEGALLA, COUCH ON INSURANCE § 1:43 (3d ed.1995).
[21] Emphasis added.
[22] Leuning, 79 Wash.2d at 399, 486 P.2d 87.
[23] RUSS & SEGALLA, supra, at § 1:43.
[24] Br. of Appellant, Appendix A (policy page 4).
[25] Leuning, 79 Wash.2d at 397-98, 486 P.2d 87. The insured debtor's estate later recovered the $10,097 also. See discussion below.
[26] First Fidelity Bank v. McAteer, 985 F.2d 114, 116 (3rd Cir.1993) (death benefits in excess of amount needed to pay creditor were payable to insured's estate as secondary beneficiary); see also Life & Cas. Ins. Co. v. Martin, 603 F.Supp. 281, 285 (E.D.Mo.) (life insurance proceeds payable to insured's estate where primary beneficiary disqualified), aff'd, 773 F.2d 208 (8th Cir. 1985); Cundiff v. Cain, 707 So.2d 187, 190 (Miss. 1998) ("[i]n the event there was no beneficiary at the time of the insured's death, benefits would be payable to his estate"); Andrews v. American Health & Life Ins. Co., 236 Va. 221, 372 S.E.2d 399, 402 (1988) (where insured did not designate a beneficiary to receive excess proceeds of credit life insurance, insured's estate was beneficiary); Keil v. John Hancock Mut. Life Ins. Co., 259 A.D. 1111, 21 N.Y.S.2d 225, 225 (1940) ("There was no beneficiary named in any of the policies and upon the death of the insured they became payable to his estate.").
[27] Br. of Appellant, Appendix A, (policy pages 1 and 4).
[28] See also Levas v. Metropolitan Life Ins. Co., 175 Wash. 159, 163, 26 P.2d 1032 (1933); Buckner v. Ridgely Protective Ass'n, 131 Wash. 174, 182-83, 229 P. 313 (1924).
[29] RCW 48.18.030(3)(b) (insurable interest includes "lawful and substantial economic interest in having the life ... of the individual insured continue"); Leuning, 79 Wash.2d at 402, 486 P.2d 87.
[30] The authorities CUNA cites in support of this "ab initio" argument are distinguishable. As CUNA describes them, the policy was "taken out by the beneficiary," Br. of Respondent at 23, (quoting W. VANCE ON INSURANCE § 31 at 183 (B. Anderson 3d ed.1951)), and the beneficiary made it "payable to himself." Br. of Respondent at 23, quoting Buckner, 131 Wash. at 182, 229 P. 313 (dictum). The policies here were not taken out by a beneficiary other than Epperly.
[31] Opinion at 858.
[32] The concurrence does not, and could not, show that the policy language is ambiguous.
[33] Opinion at 858.
[34] Opinion at 859, 860.
[35] Opinion at 860.
[36] Cf. Uslife Credit Life Ins. Co. v. McAfee, 29 Wash.App. 574, 630 P.2d 450 (1981), review denied, 97 Wash.2d 1004 (1982).
[37] Amicus is the Washington State Medical Association.
[38] Here, the Credit Union did claim against CUNA for payment of the insurance proceeds, but CUNA denied coverage. The majority recognizes that it was only after the denial of coverage that the Credit Union satisfied the loans from the secured accounts. Fortunately, the Credit Union noticed the "unusual circumstances surrounding this claim" and informed CUNA that "although Ms. Abbott may have played by the rules this is still a fraudulent situation."
[39] Under RCW 48.34.090(2), a credit life policy "shall state that the benefits shall be paid to the creditor to reduce or extinguish the unpaid indebtedness and, wherever the amount of insurance exceeds the unpaid indebtedness, that any such excess shall be payable to a beneficiary, other than the creditor, named by the debtor or to the debtor's estate."
[40] The majority argues that Abbott cannot benefit from the insurance because, based on a principal/surety relationship between Abbott and Epperly, Abbott should pay the debt and Epperly's estate should have all of his credit life insurance. The majority relies on Leuning v. Hill, 79 Wash.2d 396, 486 P.2d 87 (1971), and characterizes the holding as follows: "a deceased debtor's credit life insurance is supposed to pay the debt to the extent that the insured debtor owes it. The deceased debtor's insurance is not supposed to pay the debt to the extent that someone else owes it." Leuning does not so hold. As the court recognized, regardless of whether or not the insured is a surety for the debt, the insurer's obligation is to pay the primary beneficiary and then pay any excess to the secondary beneficiary. See Leuning, 79 Wash.2d at 402-03, 486 P.2d 87. The question in Leuning was whether, after the insurance proceeds are used to discharge the debt, the estate of the deceased debtor/surety was entitled to reimbursement from the primary obligor. The court recognized that this is a factual question based on the intent of the parties. See Leuning, 79 Wash.2d at 400, 403, 486 P.2d 87. In Leuning, the court found that the parties did not intend that the Hills, the primary obligors, would be relieved of their obligation by Leuning's death. Leuning, 79 Wash.2d at 403, 486 P.2d 87. Both Leuning and Hill obtained insurance on their own lives. Leuning, 79 Wash.2d at 399, 486 P.2d 87. The trial court found that Leuning applied for the insurance to protect the interests of his wife and his estate. Leuning, 79 Wash.2d at 402, 486 P.2d 87. Here, it cannot be seriously argued that Epperly, who apparently had no assets, was a true surety for Abbott's debt. And, the trial court found that Abbott procured the insurance on Epperly's life and paid all of the insurance premiums. Under these circumstances, it is not clear that Epperly's estate would be entitled to reimbursement if the credit life proceeds had been used to pay Abbott's debt.
[41] During the last five months of Epperly's life, Abbott and Ketchum obtained approximately $250,000 of creditor's life insurance on Epperly through credit union accounts. Abbott also arranged a number of other creditor's life transactions involving Epperly's life.
[42] "[I]f a creditor insures his or her debtor's life for a sum grossly in excess of any loss that he or she can possibly suffer by the debtor's death, the policy is a wager and invalid." 3 LEE R. RUSS & THOMAS F. SEGALLA, COUCH ON INSURANCE § 41:2 (3d ed.1995); see also 43 AM. JUR. 2D Insurance § 992 (1982).